**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| HAROLD BIRCUMSHAW, | No. 45923-0-II |
| Appellant, | |
| v. | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, HEALTH CARE AUTHORITY, | |
| Respondent. | |

BJORGEN, A.C.J. — Dr. Harold Bircumshaw appeals the Washington State Health Care Authority's (HCA) final order upholding the results of an audit of Bircumshaw's Medicaid payments and requiring payment from Bircumshaw for Medicaid overpayments. He argues that (1) HCA was not authorized by statute, regulation, or contract to demand recovery of overpayments on grounds that Bircumshaw provided insufficient documentation of the underlying services, (2) HCA improperly applied the applicable law in affirming the audit on review, (3) HCA's final order is internally inconsistent, (4) HCA's findings were not supported by substantial evidence, (5) the overpayment assessment constitutes unconstitutional punitive damages, (6) recovery of overpayment amounts would unjustly enrich the State, (7) the overpayment assessment constitutes unauthorized punitive damages, (8) the overpayment assessment amounts constitutes grossly excessive punishment in violation of his right to due process, and (9) HCA acted arbitrarily and capriciously.

For the reasons below, we disagree with each of these propositions. Accordingly, we affirm HCA's final order.

FACTS

Bircumshaw was an optometrist enrolled in the state Medicaid program. To become

eligible for enrollment, he signed a core provider agreement detailing his obligations under the

program, which included compliance with applicable regulations and policies and submission to

audits by the Department of Social and Health Services (DSHS). Between 2003 and 2006,

Bircumshaw billed DSHS for thousands of optometric procedures under the Medicaid program.

In 2007, after an internal agency review, DSHS initiated an audit of the claims

Bircumshaw billed between June 2, 2003 and May 31, 2006.[1] The scope of the audit was

expressly limited to determining whether Bircumshaw complied with applicable regulations,

program policies, and the provisions of his core provider agreement. DSHS individually audited

25 of Bircumshaw's highest paying claims, amounting to $3,599.03. DSHS then audited a

representative sample of 348 of the remaining claims and extrapolated its findings across 9,506

total claims, valued at $352,808.32.

Bircumshaw provided DSHS with partial documentation related to the audited claims, but

for most claims this documentation was sparse. Most notably, Bircumshaw relied heavily on

order forms for eyeglasses and contact lenses from Airway Optical,[2] where more thorough

---

[1] Subsequent legislation transferred DSHS's audit and recoupment authority to HCA. SECOND ENGROSSED SECOND SUBSTITUTE H.B. 1738, 62nd Leg., 1st Spec. Sess., at § 124 (Wash. 2011). DSHS, through its Medical Assistance Administration and Health and Recovery Service Administration, performed the audit and initial review of Bircumshaw's billings. HCA performed the final administrative review and issued the final order.

[2] Airway is the exclusive contracted vendor for eyeglasses and contact lenses under the Medicaid program.

records could not be produced.  Airway is the exclusive contracted vendor for eyeglasses and contact lenses under the Medicaid program.  Airway fills orders sent to it by optometrists using pre-printed order forms.  The order forms show prescriptions, fitting details, and order dates, but are generally silent as to other aspects of the optometric services performed.  In some cases, Bircumshaw had to request copies of the previously submitted order forms from Airway, as he did not have copies of the orders on hand.

In April 2009 DSHS released a final audit report, finding that:

1.      There was insufficient documentation to substantiate claims billed and paid.

Based on documentation submitted, there were 190 instances where the client record lacked sufficient documentation to substantiate claims billed and paid.

. . . .

2.      Incorrect level[s] of Evaluation and Management (E/M) code [were] billed and paid.

In 78 instances the provider billed and was paid for an E/M claim which was billed at an incorrect level of service. The provider billed the department for new and established E/M visits at levels of complexity higher than justified by the documentation in the clients' medical records.

. . . .

3.      Fitting of Spectacles and repair & re-fitting billed on same date of service.

Based on documentation submitted, there were instances where fitting of spectacles was billed with repair and refitting of spectacles for the same client, and the same date of service.

. . . .

4.      Billing errors.

Based on documentation submitted, there were 74 instances of billing errors[.]

Clerk's Papers (CP) at 871-76 (emphasis omitted).  On the basis of these findings, DSHS concluded that most of the audited claims, and a projected number of remaining claims,

constituted overpayments and that Bircumshaw was responsible for repayment of $224,114.64 plus interest.

Bircumshaw requested a review hearing before an administrative law judge, after which the ALJ issued an initial order affirming the audit findings. Bircumshaw then appealed the ALJ's decision to HCA's Board of Appeals. In its final order, the Board made 103 findings of fact and 39 conclusions of law, on which basis it affirmed audit findings 1 and 4, listed above. The Board reversed audit findings 2 and 3 on grounds that DSHS had violated Bircumshaw's right to due process by failing to properly notify him of the legal basis for its determination that the claims covered by those findings constituted overpayments. It ordered HCA to recalculate the extrapolated overpayment amount accordingly. Bircumshaw moved for reconsideration, which the Board denied.

Bircumshaw sought judicial review of the Board of Appeals' final order in superior court. After a hearing, the court affirmed the final order. Bircumshaw now appeals.

## ANALYSIS

### I. ADMINISTRATIVE PROCEDURE ACT STANDARDS OF REVIEW

We review final agency actions under the provisions of the Administrative Procedure Act (APA), chapter 34.05 RCW. RCW 34.05.510; *Puget Soundkeeper Alliance v. State*, *Pollution Control Hr'gs Bd.*, 189 Wn. App. 127, 135, 356 P.3d 753 (2015). Under the APA,

> [t]he court shall grant relief from an agency order in an adjudicative proceeding only if it determines that:
>
> (a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;
>
> (b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;
>
> . . . .

(d) The agency has erroneously interpreted or applied the law;

(e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;

. . . .

(i) The order is arbitrary or capricious.

RCW 34.05.570(3). The party asserting the invalidity of an agency order on any of these grounds carries the burden of demonstrating that the order is invalid. RCW 34.05.570(1)(a). We review the agency's final decision, not the decision of the superior court. *Pal v. State, Dep't of Soc. & Health Servs.*, 185 Wn. App. 775, 781, 342 P.3d 1190 (2015).

## II. HCA'S AUTHORITY TO RECOUP MEDICAID PAYMENTS FOR IMPROPERLY DOCUMENTED MEDICAL SERVICES

Bircumshaw argues that HCA lacked authority to recoup Medicaid payments for billed services solely on the grounds that he failed to keep adequate records regarding the provision of those services, without determining that he failed to actually provide the services. We hold that the plain meaning of the relevant statutes, regulations, and agency guidelines establishes that HCA has the ability to recoup Medicaid payments for billed services on the basis of inadequate documentation, pursuant to both statutory and regulatory authority and contractual power.

Under the "error of law" standard, we review the agency's interpretation of statutes and regulations de novo. *Puget Soundkeeper*, 189 Wn. App. at 136. When interpreting statutes and regulations, we look first to the plain meaning of the language in the context of the statutory or regulatory scheme to determine the meaning of a statute or regulation. *Id*. If a statute or regulation is ambiguous, we look to other sources in interpreting it, but will give significant

5

deference to an agency's interpretation of its own regulations and the statutes it administers. *Id*. at 137.

Similarly, we interpret contractual provisions de novo. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 712, 334 P.3d 116 (2014). We examine the provisions in the context of "the contract as a whole, interpreting particular language in the context of other contract provisions." *Id*. at 713.

1.     <u>Statutory and Regulatory Authority</u>

In the Medicaid program DSHS reimburses medical providers for billed services subject to audit and possible recoupment of prior payments. This scheme is rooted in federal law, which directs states implementing Medicaid to

> provide for claims payment procedures which . . . provide for procedures of prepayment and postpayment claims review, including review of appropriate data with respect to the recipient and provider of a service and the nature of the service for which payment is claimed, to ensure the proper and efficient payment of claims and management of the program.

42 U.S.C. § 1396a(37)(B). Consistently with these goals, 42 U.S.C. § 1396a(30)(A) states that provider payment methods must "assure that payments are consistent with efficiency, economy, and quality of care," and 42 C.F.R. § 447.45(f) requires that the state agency administering Medicaid conduct post-payment claims review that meets the requirements of sections 455 and 456 of this chapter dealing with fraud and utilization control.

To fulfill these federal requirements, several Washington statutes and regulations authorized a Medicaid audit and recoupment process administered by the Medical Assistance Administration (MAA) for DSHS.[3] The basic elements of the statutory and regulatory program scheme can be broken down into (1) a process of reimbursement for services provided subject to

---

[3] As mentioned *supra* n.1, this administrative authority was later transferred to HCA.

recoupment for overpayment, (2) recordkeeping requirements, (3) billing requirements, and (4) an audit process. Taken together, the resulting system was one by which DSHS paid for billed services, but could audit provider records and recoup any funds paid for claims that were inadequately documented or improperly billed.

A. Reimbursement and Recoupment

Under regulations applicable at the time Bircumshaw provided the services at issue here, DSHS would reimburse enrolled providers for covered medical services, equipment, and supplies they provide to eligible clients when all of the following apply:

> (a) The service is within the scope of care of the client's medical assistance program;
> (b) The service is medically or dentally necessary;
> (c) The service is properly authorized;
> (d) The provider bills within the timeframe set in WAC 388-502-0150;
> (e) The provider bills according to department rules and billing instructions; and
> (f) The provider follows third-party payment procedures.

Former WAC 388-502-0100(1) (2005).

If a provider is reimbursed for billed services for which he was not entitled to payment, HCA can recoup the amount paid for those services. Under the applicable statute, a medical provider participating in the Medicaid program

> that, without intent to violate this chapter, obtains benefits or payments under this code to which such person or entity is not entitled, or in a greater amount than that to which entitled, shall be liable for (1) any excess benefits or payments received, and (2) interest calculated at the rate and in the manner provided in RCW 43.20B.695.

RCW 74.09.220. As defined in RCW 43.20B.010(5), "any payment or benefit to a recipient or to a vendor in excess of that to which [it] is entitled by law, rule, or contract, including amounts in dispute" is an "overpayment."

7

These statutes, taken together, provided the authority for HCA to recoup overpayment amounts and interest accrued on them. DSHS implemented the statutes by regulation in former WAC 388-502-0230(3)(h) (2005), which provided that the MAA may "[r]ecover any monies that the provider received as a result of inappropriate payments."

B. Recordkeeping Requirements

Medical providers participating in the Medicaid program were required by regulations applicable during Bircumshaw's audit period to make, authenticate, and maintain records that showed their billed services met the criteria for reimbursement. Former WAC 388-502-0020(1) (2005) provided that

> Enrolled providers must:
>
> (a)     Keep legible, accurate, and complete charts and records to justify the services provided to each client, including, but not limited to:
> (i)     Patient's name and date of birth;
> (ii)    Dates of services;
> (iii)   Name and title of person performing the service, if other than the billing practitioner;
> (iv)    Chief complaint or reason for each visit;
> (v)     Pertinent medical history;
> (vi)    Pertinent findings on examination;
> (vii)   Medications, equipment, and/or supplies prescribed or provided;
> (viii)  Description of treatment (when applicable);
> (ix)    Recommendations for additional treatments, procedures, or consultations;
> (x)     X-rays, tests, and results;
> (xi)    Dental photographs and teeth models;
> (xii)   Plan of treatment and/or care, and outcome; and
> (xiii)  Specific claims and payments received for services.
>
> (b)  Assure charts are authenticated by the person who gave the order, provided the care, or performed the observation, examination, assessment, treatment or other service to which the entry pertains;
>
> (c)  Make charts and records available to DSHS, its contractors, and the US Department of Health and Human Services upon request, for six years from the date of service or longer if required specifically by federal and state law or regulation.

The regulation makes it clear that the documentation is intended "to *justify* the services provided to each client." Former WAC 388-502-0020(1)(a) (emphasis added). Under its plain meaning, providers participating in Medicaid were required to keep, authenticate, and submit at least all of the listed records that were relevant to the provision of any particular billed service.

C. Billing Requirements

Participating providers were also required to bill the State in a specific manner for authorized services. In addition to requiring recordkeeping, former WAC 388-502-0020(1) required enrolled providers to:

> (d) Bill the department according to department rules and billing instructions;
> . . . .
> (i) Provide all services according to federal and state laws and rules, and billing instructions issued by the department.

Providers were only eligible for reimbursement if "[t]he provider bills according to department rules and billing instructions." Former WAC 388-502-0100(1)(e). The applicable billing instructions included a section titled, "General Billing," that included a subsection titled, "What records must be kept?" detailing the recordkeeping requirements. CP at 1109, 1111. That section cited former WAC 388-502-0020 and reproduced the list of records that providers were required to keep under that regulation to justify billed services in the event of an audit. Therefore, under the plain meaning of the applicable rules, a provider was eligible for reimbursement only if it kept the records required by former WAC 388-502-0020.

D. Authority to Audit Participating Medical Providers

While noncompliance with former WAC 388-502-0020 and former WAC 388-502-0100 makes the provider ineligible for reimbursement, HCA's authority to recoup reimbursement

9

payments already made is established by its power to audit providers participating in the

Medicaid program. The legislature provided that

> the acceptance . . . by practitioners of reimbursement for performing [medical, dental, and other health services to recipients of public assistance and medically indigent persons] shall authorize the secretary of the department of social and health services or his designee, to inspect and audit all records in connection with the providing of such services.

Former RCW 74.09.200 (2006). Pursuant to this statutory authority, DSHS delegated to the

MAA the power to "conduct[] audits as necessary to identify benefits or payments to which

contractor/providers are not entitled." Former WAC 388-502-0240(3-4) (2005). Such audits

were conducted by "[a]n examination of provider records" to determine, among other things,

whether the provider was "[c]omplying with the rules and regulations of the program" and

"[b]illing allowable costs." Former WAC 388-502-0240(6)(a), (7)(a)(i), (iii).

The MAA could conduct the audits "on a claim-by-claim basis, or using a probability

sample." Former WAC 388-502-0240(9). When using the "probability sample" method, the

MAA was authorized to select sample claims "sufficient to ensure a minimum ninety-five

percent confidence level," former WAC 388-502-0240(10)(c); examine those sample claims "for

compliance with relevant federal and state laws and regulations, department billing instructions,

and numbered memoranda," former WAC 388-502-0240(10)(b); and then extrapolate the results

across the universe of all audited claims to project the total number of noncompliant claims,

former WAC 388-502-0240(11)(b). If the examined sample claims demonstrated

noncompliance, the MAA could statistically project the total overpayment and recoup the

amount of the "statistically calculated overpayments." Former WAC 388-502-0240(11)(a).

The plain meaning of the aforementioned statutes, regulations, and instructions reveals

that the MAA had regulatory authority pursuant to federal and state statutory delegations to audit

Bircumshaw's Medicaid billings and request the records he was required to keep under former WAC 388-502-0020 and the DSHS billing instructions. The same plain meaning also establishes HCA's authority to recoup overpayment amounts from Bircumshaw as determined on a claim-by-claim basis or by probability sampling and projection.

2.      Contractual Authority

HCA also had the power to recoup overpayment amounts pursuant to a provision in Bircumshaw's core provider agreement.[4]  To enroll in the Medicaid program, and therefore to be eligible for reimbursement payments, a provider was required by DSHS regulations to sign a core provider agreement.  Former WAC 388-502-0010(2).  Bircumshaw signed such an agreement.  Among its terms were the following provisions:

> For six (6) years from the date of services, or longer if required specifically by law, the Provider shall:
> a.  Keep complete and accurate medical and fiscal records that *fully justify and disclose* the extent of the services . . . furnished and claims submitted to the department.
>
> b.  The Provider shall make available upon request any documentation . . . for review by the professional staff within [DSHS] or the Secretary of the U.S. Department of Health and Human Services.  The Provider understands that *failure to submit or failure to retain adequate documentation* for services billed to the department *may result in recovery of payments for medical services not adequately documented*, and may result in the termination or suspension of the Provider from participation in the medical assistance and medical care programs.

---

[4] Bircumshaw seems to argue that HCA did not incorporate contractual provisions into the scope of the audit.  However, the final audit report clearly stated that "[t]he scope of the audit was limited to measuring compliance with regulations stated in Revised Code of Washington (RCW), Washington Administrative Code (WAC), *the provider's Core Provider Agreement with DSHS*, the Schedule of Maximum Allowances, Billing Instructions, and Numbered Memoranda."  CP at 870 (emphasis added).  In addition, the final order reiterated that "[t]he scope of the audit was to measure compliance with regulations stated in the Revised Code of Washington (RCW), Washington Administrative Code (WAC) and *Dr. Bircumshaw's Core Provider Agreement with DSHS*, the Schedule of Maximum Allowances, Billing Instructions and Numbered Memoranda."  CP at 16 (emphasis added).  Bircumshaw cites to no contrary source for his argument.

11

CP at 706 (emphasis added). The agreement also incorporated by reference "all federal and state laws, rules, and regulations and all program policy provisions." CP at 705.

These provisions clearly required Bircumshaw to keep records sufficient to fully justify the services he provided and to submit those records in the event of an audit. Failure to submit records fully justifying billed services is grounds for recoupment of money paid for those services under this contract. These provisions are independent of the actual provision of the billed services or their medical necessity. The only limit on DSHS's recoupment power is that it extends only six years from the date the services were provided, unless otherwise specifically required by law. Here, DSHS limited its audit to a universe of services provided from June 2003 to May 2006, conducted the audit in January 2008, and issued its final order in April 2009, so all services were provided within six years of the audit. Therefore, payments for any such services for which Bircumshaw failed to retain adequate documentation were subject to recoupment under the contract.

The only interpretive issue presented by the contract is what constitutes "adequate documentation" necessary to "fully justify and disclose" billed services under the contract. CP at 706. The terms are not defined by the core provider agreement itself. However, because the contract expressly incorporates state regulations and program policy provisions, it incorporated former WAC 388-502-0020(1). As discussed above, that regulation identified a nonexclusive list of records participating providers were required to keep and maintain "to *justify* the services provided to each client." Former WAC 388-502-0020(1)(a) (emphasis added). While the contractual requirement to "fully justify and disclose" such services may be read to require more stringent documentation than the incorporated regulation, it should not be read to require less.

CP at 706. At the least, the contract requires keeping and submission of any records listed in former WAC 388-502-0020(1) that were relevant to the provision of a particular billed service.

Here, HCA found specifically that Bircumshaw failed to submit the relevant records required under former WAC 388-502-0020(1) to justify his billings. Therefore, HCA was authorized by its contractual power to recoup payments for all such services.

3.      Authority to Recoup for Improperly Billed Services Without Proving the Services Were Not Actually Provided or Were Not Medically Necessary

Bircumshaw argues that HCA was not authorized to recoup payments already made solely on grounds that he failed to make or disclose necessary documentation for those services, without establishing that the services were not actually provided or were not medically necessary. According to this argument, DSHS may not "deny payment to practitioners for medically necessary services to covered individuals for technical violations unrelated to the provision of such service." Br. of Appellant at 36.

Bircumshaw's argument is at odds with the plain meaning of former WAC 388-502-0100. That regulation allows payment for medical services furnished to eligible clients only when *all* of the following apply:

> (a)  The service is within the scope of care of the client's medical assistance programs;
> (b)  The service is medically or dentally necessary;
> (c)  The service is properly authorized;
> (d)  The provider bills within the timeframe set in WAC 388-502-0150;
> (e)  The provider bills according to department rules and billing instructions; and
> (f)  The provider follows third-party payment procedures.

Former WAC 388-502-0100(1). Subsection (f) requires that billing be in compliance with the rules and billing instructions. There is no special primacy given to medical necessity or actual provision of services, though both are also required for payment. The express language of the

13

core provider agreement bolsters this regulation by providing that HCA may recoup payments for failure to keep or submit proper documentation, without tying or subordinating that power to any determination that the billed services were medically necessary or actually provided.

We hold that HCA may recoup the payments pursuant to both Bircumshaw's core provider agreement and the statutory and regulatory scheme. This authority does not require HCA to determine or prove that services were not actually provided or were not medically necessary.

### III.  HCA's APPLICATION OF THE RECORDKEEPING REQUIREMENTS

Bircumshaw argues that because former WAC 388-502-0020(1) and the DSHS billing instructions list only generalized categories of records that providers must keep, HCA erred by failing to "acknowledge" other records as evidence of compliance. Br. of Appellant at 30. We disagree.

As with an agency's interpretation of statutes and regulations, we review an agency's application of the law de novo under the "error of law" standard. *Puget Soundkeeper*, 189 Wn. App. at 136.

Bircumshaw suggests that an auditor familiar with the practice of optometry could infer from the Airway order forms all of the information encompassed by the necessary documentation, and therefore those order forms were sufficient to fully justify his billings. However, the relevant statutes, regulations, and policies establish that providers participating in the Medicaid program were ineligible for reimbursement if they failed to keep the particular types of applicable records specified in former WAC 388-502-0020(1). As noted, Bircumshaw's core provider agreement contained the same provision as a matter of contract. Neither source

indicates that substantial compliance with the recordkeeping requirement would be sufficient or that the production of records other than those specified would satisfy the requirement.

Bircumshaw characterizes former WAC 388-502-0020 as merely requiring the production of *a* medical record from which an auditor could infer sufficient facts to show that services were provided and medically necessary. But the plain language of the regulation belies that characterization: "Enrolled providers must: (a) [*k*]*eep* legible, accurate, and *complete charts and records*," including but not limited to those it specifies; "[*a*]*ssure charts are authenticated*"; and "[*m*]*ake charts and records available*." Former WAC 388-502-0020(1)(a)-(c) (emphasis added). This language plainly indicates that it does not matter whether some medical records could be read to show that the billing related to actually provided, medically necessary services; it matters only whether the provider kept, authenticated, and submitted the applicable records specified in the regulation.

DSHS limited the scope of its audit to measuring compliance with regulations, contractual obligations, and department instructions and policies. Further, HCA clearly found in its final order that Bircumshaw failed to provide—or prove that he ever made, authenticated, and kept—most of the required medical records for many of the audited claims, as was necessary to comply with those requirements. HCA did not err by refusing to accept other records as substitutes for the required records.

## IV. FACTUAL FINDINGS REGARDING THE SUFFICIENCY OF BIRCUMSHAW'S DOCUMENTATION

Bircumshaw argues that even if HCA had the authority to recoup payments for inadequately documented services, it erred by finding that his documentation was inadequate. We treat this as an argument that substantial evidence did not support HCA's findings. We hold that Bircumshaw has waived any claim of error as to most of the HCA findings by failing to

properly identify or assign error to them, and that the several findings he identifies are supported by substantial evidence.

1.      Failure to Assign Error

An appellant must separately assign error to each finding that he challenges on appeal, must identify each challenged finding by number, and must separately assign error to any challenged administrative findings. RAP 10.3(g)-(h). Where an appellant fails to assign error to administrative findings, we treat those findings as verities unless the appellant's briefing makes it clear which findings he is challenging and on what grounds he challenges them. *Fuller v. Dep't of Emp't Sec.*, 52 Wn. App. 603, 606, 762 P.2d 367 (1988).

Bircumshaw fails to expressly assign error to any of the HCA's administrative findings. Instead, he assigns error in a sweeping manner to the agency's refusal to "acknowledge" the inferences that Bircumshaw argues it should have made from the evidence presented. Br. of Appellant at 1-2. HCA's final order includes 103 different findings, and the administrative record is thousands of pages long. It is acutely unfair to expect HCA or this court to search such a voluminous order and record to identify which of these many findings might be affected by Bircumshaw's sweeping assignments of error. Because Bircumshaw has failed to properly identify the particular findings he challenges, all such findings would normally be treated as verities on appeal.

However, Bircumshaw mentions in his briefing several findings that he believes were erroneous. Liberally interpreting RAP 10.3, we may in our discretion review findings to which the appellant fails to properly assign error as long as the appellant has identified those findings and the nature of his challenges to them elsewhere in the brief. *See Fuller*, 52 Wn. App. at 605. In the facts section of his opening brief, Bircumshaw specifies several particular findings by

16

number and explains the contours of what appear to be sufficiency of the evidence arguments against them. In the interest of justice, we choose to review those specified findings.

2.      Sufficiency of the Evidence Supporting the Specified Findings

We will reverse an administrative agency's order if the agency's findings are not supported by substantial evidence. RCW 34.05.570(3)(e). We view the evidence in the light most favorable to HCA, the party that prevailed before the highest forum that exercised fact-finding authority. *Miotke v. Spokane County*, 181 Wn. App. 369, 376, 325 P.3d 434, *review denied*, 181 Wn.2d 1010 (2014). Substantial evidence is evidence sufficient to "persuade a fair-minded person of the truth or correctness of the order." *Id*. at 375-76.

A. Evidentiary Value of Airway Order Forms

Before turning to specific findings, we address Bircumshaw's general argument that the Airway order forms are sufficient to justify his billing because they establish that he provided medically necessary services to eligible patients. The order forms show only that Bircumshaw ordered eyeglasses or contact lenses from Airway. The forms provide other details related to the prescriptions, but do not establish that Bircumshaw provided any particular services to any particular patients on particular dates. Standing alone, the order forms do not constitute substantial evidence of the provision of services.

Were we to hold otherwise, the potential for fraud on the Medicaid system would be too great. An optometrist could send fraudulent orders to Airway for eyeglasses or contact lenses without actually seeing a patient or without determining that ordered hardware is medically necessary. If those orders were sufficient to prove the provision of services, HCA would be effectively unable to uncover the fraud. This is directly contrary to the policy rationale supporting Medicaid's audit requirement.

B.  Finding 53

HCA found that for a particular billed procedure "there is no chart note for date of service showing a refraction was performed for the patient on the date claimed." CP at 27. Without this chart note, HCA could not determine whether "the patient was actually seen, treated, what services were provided, and why the services were medically necessary." CP at 28. The only documentation Bircumshaw produced related to the procedure was an Airway order form and an appointment schedule showing the patient's appointment time.

Bircumshaw argues that the order form and appointment schedule demonstrated that he performed the procedure and that it was medically necessary. But the records in fact prove neither of those things. Evidence that an appointment was scheduled is not evidence that "the patient was actually seen [and] treated." CP at 28. Further, while the resulting prescription on the order form provides some evidence that the patient may have been seen, it is silent as to medical necessity. When viewed in the light most favorable to HCA, the order form and appointment schedule are inadequate documentation. Therefore, substantial evidence supports this finding.

C.  Finding 54

HCA found that for another billed procedure, a handwritten date added over the top of the printed date on an automatically generated examination record was inadequate to determine "what, if anything, occurred" on the handwritten date. CP at 28. The only corroborating evidence Bircumshaw produced was a receipt for sunglasses purchased on the handwritten date.

Bircumshaw argues that "the Department unilaterally changed the medical record without any basis" by refusing to credit the handwritten date. Br. of Appellant at 24. But the handwritten date change, without some corroborating evidence that Bircumshaw performed the

billed procedure, does not establish that the examination took place on the date written. The mere evidence that the patient purchased sunglasses on the same date does not corroborate performance of any procedure. When viewed in the light most favorable to HCA, the evidence does not establish that Bircumshaw performed the billed procedure on the handwritten date. Therefore, HCA's finding is supported by substantial evidence.

D.  Findings 55 and 68

HCA found that for several billed contact lens fittings and dispensings, Bircumshaw did not provide "chart notes that verify the fitting and dispensing of contact lenses." CP at 29, 33-34. In particular, Bircumshaw did not document if or when he provided the dispensing service. Further, Bircumshaw did not show that the fittings and dispensings were authorized prior to service, as authorization depended on whether the patient had received covered eyeglasses within the last two years or whether exceptional approval was granted by DSHS.

Bircumshaw argues that the order forms showed that he performed the fittings and dispensings, which must have been authorized because Airway did not reject the orders. The order forms, however, are silent as to whether and when Bircumshaw actually dispensed the contact lenses. Viewing the order form in the light most favorable to HCA, the fact that Airway fulfilled the orders does not show that they were in fact authorized, as it shows neither prior eyeglass orders nor any special DSHS approval. Moreover, even if Bircumshaw had provided more than just Airway order forms, he failed to provide the necessary chart notes. Therefore, these findings are supported by substantial evidence.

E.  Findings 56, 69, 70, and 75

HCA found that Bircumshaw also failed to document billed eyeglass fittings and dispensings. In particular, Bircumshaw failed to provide the dates of fitting, the medical

necessity for the new fittings, or that he actually dispensed the eyeglasses. For some of these records, Bircumshaw provided only Airway order forms showing the hardware specifications, and some of these were not even initially among his records. For others, his documentation was simply missing the fitting date.

Bircumshaw argues that because no evidence showed that he did *not* actually dispense the eyeglasses, HCA erred by finding his documentation insufficient. But whether his documentation adequately recorded the dispensation of the eyeglasses and their medical necessity is an independent issue from whether evidence showed that those procedures were fraudulent. The Airway order forms do not show whether or when Bircumshaw dispensed the ordered eyeglasses or whether the new fittings were medically necessary. Further, testimony showed that Bircumshaw sometimes ordered eyeglasses to replenish his stock for use in future repairs, calling into question whether any particular ordered hardware was actually dispensed to the patient. Considering the lack of documentation and this testimony, we hold that substantial evidence supported these findings.

F.  Findings 57, 58, 59, 71, and 84

HCA found that Bircumshaw failed to properly document eyeglass repairs and refittings and therefore failed to show the necessity of repair and refitting, the absence of warranty coverage on the patients' previous eyeglasses, prior authorization from DSHS, and actual provision of the service. Bircumshaw again primarily provided Airway order forms as documentation.

Bircumshaw argues that the billed procedure did not include dispensing of the repaired or refitted eyeglasses. This, however, is irrelevant to determining whether the findings are supported by substantial evidence, because the findings relate to justification, authorization, and

20

performance of the repairs and refittings. The Airway order forms show only that eyeglasses were ordered, not whether any particular patient's circumstances justified repair or refitting or whether any such services were authorized or properly billable. Substantial evidence supports these findings.

G. Finding 102

HCA found that Bircumshaw billed for fittings performed too soon after the patient's previous fitting to qualify for reimbursement. It noted that providers must obtain prior authorization for fittings to ensure compliance with the frequency limits and found that Bircumshaw provided no records showing grounds for prior authorization or actual obtainment of prior authorization. Again, Bircumshaw provided only Airway order forms as documentation.

Bircumshaw argues that such documentation was impossible to produce because he could not know whether or when new patients last ordered eyeglasses. However, Bircumshaw provided no evidence, and does not argue on appeal, that the billings in question were for new patients' fittings or that erroneous reporting by new patients was responsible for his improper billing for any particular fitting.

Bircumshaw also suggests that the Airway order forms should show that the billing intervals were correct because Airway would otherwise have rejected the claims. However, as HCA notes in the finding, prior authorization is sometimes available for fittings that would otherwise be too frequent. Because the Airway order forms indicated too frequent fittings and were silent as to prior authorization or grounds for such prior authorization, substantial evidence supports this finding.

## V. INTERNAL INCONSISTENCY IN HCA'S FINAL ORDER

Bircumshaw argues that HCA erred by issuing a final order so internally inconsistent that it must be reversed. We disagree that the final order is inconsistent.

It is unclear exactly what sort of internal inconsistency Bircumshaw believes the final order suffers from, but he seems to contend that HCA acted inconsistently by reversing audit findings 2 and 3 while upholding findings 1 and 4. His argument appears to rest on the assumption that HCA reversed findings 2 and 3 on grounds that Airway order forms were sufficient documentation of the billed services. The final order, however, expressly and clearly reversed findings 2 and 3 on due process grounds because HCA failed to notify Bircumshaw of the legal basis for recoupment, not because the evidentiary basis for the findings was insufficient. Findings 1 and 4 suffered from no such defect, so HCA upheld them in the final order. In addition, HCA's factual findings in the final order indicated that the evidence actually supported findings 2 and 3. Nothing in the final order indicates that HCA considered Airway order forms adequate documentation of the services Bircumshaw billed. Because the due process defect existed only as to the claims covered by findings 2 and 3, HCA did not act inconsistently in upholding findings 1 and 4.[5]

---

[5] Bircumshaw argues also that the Board erred by ordering recalculation of the extrapolated overpayment amount after reversing findings 2 and 3 because the reversal of those findings made it impossible for HCA to achieve a 95 percent statistical confidence level in any recalculated projections. Because the Board reversed findings 2 and 3 but did not order any alteration to the underlying sample set of claims upon which HCA's projections would be based, the confidence level would be unaffected by the reversal. The only effect of the reversal is to require HCA to treat the claims covered by findings 2 and 3 as properly paid rather than overpaid.

VI. Unjust Enrichment

Bircumshaw argues that the State would be unjustly enriched if HCA recoups the assessed overpayment amount, because Bircumshaw actually provided the billed services but would not be paid for them. We disagree.

Unjust enrichment is a basis for recovering the value of a benefit conferred on another party in the absence of a contractual relationship. *Austin v. Ettl*, 171 Wn. App. 82, 92, 286 P.3d 85 (2012). A party claiming unjust enrichment must show three things: (1) conferral of the benefit, (2) knowing acceptance or retention of the benefit, and (3) lack of adequate compensation for the benefit. *Id*. It is a theory of liability rooted in equity rather than wrongdoing. *Davenport v. Wash. Educ. Ass'n*, 147 Wn. App. 704, 726, 197 P.3d 686 (2008).

It is not clear that unjust enrichment may be raised as a defense to an adjudicative administrative order. *See* RCW 34.05.570(3) (not providing for judicial relief from administrative orders on equitable grounds); *Suburban Fuel Co. v. Lamoreaux*, 4 Wn. App. 179, 180, 480 P.2d 216 (1971) ("the existence of 'unjust enrichment' is no defense to the enforcement of [a] statute") (quoting *Stewart v. Hammond*, 78 Wn.2d 216, 480 P.2d 216 (1971)). Bircumshaw cites to no authority for the use of the doctrine in this manner, and it appears that none exists. In addition, because Bircumshaw's relationship with HCA was governed by contract, unjust enrichment would not be an appropriate theory of liability. His claim of unjust enrichment therefore fails.

VII. Unauthorized Punitive Damages

Bircumshaw argues that the overpayment assessment against him constitutes an unauthorized award of punitive damages. We hold that the assessment is not a punitive damages award.

Damages awards may be compensatory or punitive in nature. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S. Ct. 1513, 155 L. Ed. 2d 585 (2003). Compensatory damages are intended to redress a loss or injury, while punitive damages serve a deterrent function. *Id.* Punitive damages are not permitted in Washington unless expressly authorized by statute. *Broughton Lumber Co. v. BNSF Ry. Co.*, 174 Wn.2d 619, 638 n.14, 278 P.3d 173 (2012). Similarly, contractual provisions amounting to a penalty will not be enforced. *Buchanan v. Kettner*, 97 Wn. App. 370, 373, 984 P.2d 1047 (1999).

To the extent the recoupment can even be characterized as an award of damages, those "damages" would be compensatory rather than punitive. As HCA points out, the recoupment is "expressly tied, on a dollar-for-dollar basis, to claims for which Dr. Bircumshaw was not entitled to payment." Br. of Resp't at 24. Because the overpayment assessment aims to directly redress the injury sustained by the State of Washington due to Bircumshaw's retention of payments to which he was not entitled, the assessment is compensatory in nature. While the recoupment may have some deterrent effect, that is clearly not the reason for its inclusion in the Medicaid program and the core provider agreement. "An action is not punitive simply because the defendant sees it as so." *State v. McCarter*, 173 Wn. App. 912, 918, 295 P.3d 1210 (2013). HCA imposed no punitive damages.

## VIII. DUE PROCESS VIOLATION

Bircumshaw argues that HCA violated his constitutional right to due process and acted arbitrarily and capriciously by imposing an excessive award. We disagree.

We review claimed violations of constitutional rights de novo. *Pal*, 185 Wn. App. at 781. Arbitrary agency decisions violate a citizen's right to substantive due process. *Nieshe v. Concrete Sch. Dist.*, 129 Wn. App. 632, 640-41, 127 P.3d 713 (2005). Grossly excessive

punitive awards are arbitrary in this manner. *BMW of North Am., Inc. v. Gore*, 517 U.S. 559, 568, 116 S. Ct. 1589, 134 L. Ed. 2d 809 (1996).

Bircumshaw argues that because HCA has not determined whether the services for which Bircumshaw billed were actually performed, any recoupment was grossly excessive in light of the established actual harm. He bases his argument on *Gore*, in which the United States Supreme Court specifically addressed the due process limits on punitive damages. 517 U.S. at 568. In that context, the Court held that "[o]nly when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Id.* at 569.

As discussed above, the recoupment did not constitute an award of punitive damages. *Gore*, therefore, is inapplicable. Further, because the recoupment was directly tied to the value of reimbursement payments for services Bircumshaw failed to properly document, the amount was not excessive, much less grossly so. The harm here was Bircumshaw's failure to keep adequate records, making it impossible to determine whether he actually provided the services for which he billed the State. Bircumshaw has not shown a due process violation.

IX.  ARBITRARY AND CAPRICIOUS ACTION

Bircumshaw argues, apart from his due process argument, that HCA's recoupment of payments was arbitrary and capricious. We disagree.

When reviewing an agency action to determine whether it was arbitrary and capricious, we give substantial deference to the agency. "A rule is arbitrary or capricious only if it is willful, unreasoning, and taken without regard to the attending facts or circumstances." *Ass'n of Wash. Spirits & Wine Distrib. v. Wash. State Liquor Control Bd.*, 182 Wn.2d 342, 358, 340 P.3d 849

(2015). The party asserting arbitrary and capricious action bears the "heavy burden" of showing that an agency clearly and willfully erred. *Id*.

Bircumshaw claims that HCA's "demand for form over substance was not warranted by any regulation and was arbitrary and capricious." Br. of Appellant at 26. But, as discussed above, HCA's action was warranted by clear regulatory requirements. HCA acted according to established statutory, regulatory, and contractual authority to recoup payments based on a probabilistic audit. Nothing in the record indicates that HCA acted in an "unreasoning" manner "without regard to the attending facts and circumstances"; in fact, it is clear from the voluminous final order that HCA went to great lengths to show its reasoning and the various facts undergirding its decision. Bircumshaw has failed to show that HCA acted arbitrarily or capriciously by ordering recoupment.

## CONCLUSION

We affirm HCA's final order.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Bjorgen, A.C.J.

We concur:

Maxa, J.

Lee, J.