IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Parentage of: )
)
P.J.M., )   No. 79102-8-I
)   (consolidated with 79500-7-I)
Child. )
)   DIVISION ONE
BENJAMIN S. PORTER, )
)
Respondent, )
v. )   UNPUBLISHED OPINION
)
CHRISTY M. MCKINLEY, )   FILED: September 23, 2019
)
Appellant. )
_____)

SMITH, J. — The child relocation act (CRA), RCW 26.09.405-.560, establishes a clear presumption that the parent with whom a child resides a majority of the time will be allowed to relocate with the child.[1] To rebut this presumption, the objecting parent must establish that the detrimental effect of the relocation outweighs the benefit of the change to the child *and the relocating parent*. The court considers a number of mandatory factors to determine the detrimental effect but must apply the statutory presumption in favor of relocation to resolve competing claims about relocation. Here, it is undisputed that Christy McKinley was the parent with whom her son P.J.M. resided a majority of the

---

[1] The CRA was amended in 2019, after the trial court's decision in this case, such that the presumption no longer applies when the person proposing relocation of the child has substantially equal residential time. See LAWS OF 2019, ch. 79, § 1, codified as RCW 26.09.525. That amendment does not affect the outcome in this case.

time, both when she requested relocation and through trial. Nevertheless, the trial court failed to properly apply the presumption in this case. The record also establishes that the trial court failed to consider one of the statutory relocation factors and that it resolved the parents' competing claims about relocation based on what it believed would be in P.J.M.'s best interests, without properly considering the interests and circumstances of the relocating parent, McKinley.

We hold that the trial court abused its discretion by failing to give effect to the statutory presumption, failing to consider one of the relocation factors, and using an incorrect standard to resolve the parents' competing claims about relocation. We hold further that if the trial court had properly applied the presumption and considered the presumed benefits of relocation to both P.J.M. and McKinley, relocation should have been granted. Therefore, we reverse the trial court's order restraining relocation and the trial court's modifications to the parenting plan and remand to the trial court with instructions to enter an order allowing P.J.M. to relocate with McKinley. We affirm the trial court's other challenged rulings as further discussed in this opinion. On remand, we direct the trial court to assign the case to a different judge for the limited purpose of determining what modifications to the parties' 2016 parenting plan are necessary as a result of P.J.M.'s relocation.

## BACKGROUND

Christy McKinley and Benjamin Porter had a brief relationship in 2013 after they met on a dating website. Although Porter was married and had three children at the time, he initially was "not forthcoming" on the dating website about

his marital status. Porter worked for Microsoft, and McKinley was a law student. McKinley had a son, B.R., from a previous relationship with Bradley Rasmussen. McKinley and Porter dated for a few months and near the end of that time, they conceived P.J.M.

Porter, whose family was part of a conservative religious community, did not handle the news of the pregnancy well. He was consumed with anxiety about destroying his family. According to his own testimony, he "just started spiraling." As the trial court later wrote,

> [f]or a brief time it is safe to say that [Porter] fell apart. [McKinley] struggled to engage with him during this period; [Porter] actually sought an anti-harassment order against her because he was afraid she would share news of the pregnancy with his wife before he had the opportunity to do so. These circumstances set in motion very strained communication between the parties that continue to this day.

Porter dismissed his antiharassment petition after the parties mutually agreed to an order prohibiting contact. Porter also disclosed his affair to his wife, Erin, and tried to repair his relationship with her.[2] Porter and Erin ultimately separated in late summer of 2014 and divorced in May 2015. They are raising their three children according to a 50-50 parenting plan.

Meanwhile, McKinley graduated from law school in December 2013. Her first job out of law school was a contract position at Microsoft that paid very well but was not a law-related position.

P.J.M. was born on June 25, 2014, and a friend of McKinley's notified

---

[2] Because Porter and his former wife share a last name, we refer to Erin by her first name.

3

Porter of P.J.M.'s birth. Porter again requested an antiharassment order, arguing among other things that this outreach, together with McKinley's presence on the Microsoft campus, were violations of the agreed order prohibiting contact. A King County District Court judge denied the petition.

In September 2015, when P.J.M. was a year and three months old, Porter petitioned to establish paternity. Porter first met P.J.M. in October 2015 when P.J.M. was 16 months old.

The court in the parentage action appointed Dr. Jennifer Wheeler as the parenting evaluator pursuant to the parties' agreement. Dr. Wheeler described P.J.M. as "a cheerful, outgoing, resilient, ~20 month old boy, who appears to be developing within normal limits in all spheres." She attributed his resilient temperament to "the fact that he was born to two loving and highly skilled parents—both of whom already have significant parenting experience." She noted, however, that "[u]nfortunately for [P.J.M.], the majority of his parents' first-hand experiences with one another occurred under extreme and emotionally-charged circumstances." Dr. Wheeler wrote that, as a result, "Ms. McKinley appears to have developed a strong, persistent negative bias regarding Mr. Porter" and that "Mr. Porter's reaction to [McKinley's pregnancy] appears to have triggered significant anger and disdain from Ms. McKinley, who has assumed a persistently adversarial and/or suspicious orientation towards him." That said, Dr. Wheeler acknowledged that "[t]his is not to say that Mr. Porter does not have a negative orientation towards Ms. McKinley; indeed, each of these parents has engaged in behaviors that has [sic] resulted in the other assuming a

4

defensive/mistrusting orientation towards the other." In a 33-page report issued in February 2016, Dr. Wheeler recommended a phased-in 50-50 parenting plan under which Porter's time with P.J.M. would increase until P.J.M. turned five years old, at which time P.J.M. would begin living with Porter and McKinley on an equal 50-50 basis.

A parentage trial began in July 2016. Meanwhile, in late June of 2016, McKinley learned that she would be laid off from Microsoft pursuant to a policy that placed a time limit on contract positions. At the time, McKinley was renting a large home in Bellevue. "She tried her best to stay there as she struggled to find a lawyer job in the Seattle/Bellevue area" but was unsuccessful.

The parentage trial concluded at the beginning of August 2016. In November 2016, the trial court entered a parenting plan that tracked Dr. Wheeler's recommendations, including the phased-in 50-50 residential schedule that would begin in June 2019 when P.J.M. turned five. The trial court did not include any findings in its order.

On May 9, 2017, McKinley gave Porter notice of her intent to relocate to the Olympia area. She had been offered a position as a hearing examiner at the Office of the Insurance Commissioner in Olympia, which "was very fortunate, as at about the same time her landlord [in Bellevue] served her with a three day pay or vacate notice." On June 25, 2017, McKinley moved into an apartment in University Place. A couple of months after relocating to University Place, McKinley was terminated from her hearing examiner position. But she was soon thereafter hired as a contract attorney for the Pierce County Department of

Assigned Counsel to represent foster children, a job that "[s]he has come to enjoy."

Porter objected to relocation and sought a modification to the parenting plan. He requested, among other things, that the court "change the person the child lives with most of the time," from McKinley to Porter. He also requested to have Dr. Wheeler reappointed as a parenting evaluator. The trial court reappointed Dr. Wheeler over McKinley's objection and ordered that Dr. Wheeler's fee be paid 50-50 by the parties.

Dr. Wheeler issued her report on April 19, 2018. In her conclusions and recommendations, she wrote, "It remains my opinion that [P.J.M.]'s best interest would be most effectively served by continuing to have frequent, meaningful access to both of his parents—such as the residential schedule that was provided by the Final Parenting Plan, that was issued by the court in November 2016." She recommended that "until/unless mother returns to the Bellevue area," the parenting plan be modified such that Porter would be the primary residential parent and McKinley would have P.J.M. every other weekend and visitation each Tuesday.

A relocation trial was held in June 2018 before a different judge than the judge that presided over the parentage trial. In the meantime, McKinley and her partner, Lars Sommer, whom McKinley had been dating since April 2017, conceived a child due in September 2018. During trial, they also closed on a house in University Place that they purchased together.

Dr. Wheeler, McKinley, Porter, Sommer, and Kelsea Laegreid, Porter's

new wife, testified at trial. The court also heard testimony from Dr. Christopher Tobey, McKinley's expert, and Hayley Jacobson, Porter's education expert. Toward the conclusion of trial, the court made several comments on the record stating its intent to try to honor the originally contemplated 50-50 parenting plan.

The trial court ultimately denied relocation and entered a modified parenting plan. In its findings, the trial court stated that "[i]n this case, the Court will apply the rebuttable presumption set forth in RCW 26.09.520, but weigh it somewhat less heavily than the Court would in another case without a 50-50 plan having been ordered."

At the time of trial, McKinley was the primary residential parent and would be until P.J.M. turned five in June 2019. Indeed, under the parenting plan then in effect, P.J.M., who had met Porter for the first time less than three years earlier, spent less than 20 percent of his time with Porter.[3] Nevertheless, the trial court ordered that a 50-50 week-on/week-off residential schedule begin immediately— almost a year earlier than originally contemplated—until P.J.M. started kindergarten. It also ordered two alternative residential schedules for after P.J.M. started kindergarten: "Schedule A," which would go into effect if McKinley did not permanently relocate back within a 60-minute drive of Porter's house before the 2019-2020 school year; and "Schedule B," which would go into effect if McKinley did move back before the 2019-2020 school year. Under Schedule A, Porter would be P.J.M.'s primary residential parent except that he would spend every

---

[3] The 2016 parenting plan provides that from age three to five, P.J.M. would spend, over each two-week period, a total of 64 hours with Porter.

other weekend with McKinley, plus a weekly Tuesday night overnight. Schedule B was the same 50-50 residential schedule that would have begun when P.J.M. turned five under the 2016 parenting plan. The trial court also designated Porter as the sole decision-maker for education and nonemergency healthcare-related decisions about P.J.M. (whereas, under the 2016 parenting plan, the parents had joint decision-making authority). McKinley appeals, challenging the trial court's denial of relocation and various other related decisions.

## ANALYSIS

### DENIAL OF RELOCATION

McKinley argues that the trial court abused its discretion by denying her request to relocate with P.J.M. We agree.

The CRA sets forth notice requirements and standards for changing the primary residence of a child who is subject to a court order regarding residential time. In re Marriage of McNaught, 189 Wn. App. 545, 553, 359 P.3d 811 (2015). "If a person entitled to residential time or visitation objects to a child's relocation, the person seeking to move the child may not relocate the child without court approval." McNaught, 189 Wn. App. at 553. "Upon a proper objection, a trial court must conduct a fact-finding hearing on the proposed move." McNaught, 189 Wn. App. at 553. To that end, RCW 26.09.520 "creates a rebuttable presumption that relocation will be permitted." In re Marriage of Horner, 151 Wn.2d 884, 887, 93 P.3d 124 (2004). To rebut this presumption, the objecting party must demonstrate "that the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person."

RCW 26.09.520.[4] The court considers the following factors to determine whether the objecting party has rebutted the presumption in favor of relocation:

(1) The relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life;

(2) Prior agreements of the parties;

(3) Whether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation;

(4) Whether either parent or a person entitled to residential time with the child is subject to limitations under RCW 26.09.191;

(5) The reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation;

(6) The age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child;

(7) The quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations;

(8) The availability of alternative arrangements to foster and continue the child's relationship with and access to the other parent;

(9) The alternatives to relocation and whether it is feasible and desirable for the other party to relocate also;

(10) The financial impact and logistics of the relocation or its prevention; and

(11) For a temporary order, the amount of time before a final decision can be made at trial.

RCW 26.09.520. The factors are neither weighted nor listed in any particular order. RCW 26.09.520. Consideration of the factors "is logical because they serve as a balancing test between many important and competing interests and

---

[4] Because RCW 26.09.520(3) was amended in 2019, we cite to former RCW 26.09.520(3) (2000) for that subsection. The remainder of RCW 26.09.520 is unchanged; thus, we cite to the current statute for all other references to the statute, including its preamble and other subsections.

circumstances involved in relocation matters." Horner, 151 Wn.2d at 894.

"Particularly important in this regard are the interests and circumstances of the

relocating person." Horner, 151 Wn.2d at 894. To that end, by establishing a

rebuttable presumption that relocation will be allowed, the CRA "both

incorporates and gives substantial weight to the traditional presumption that a fit

parent will act in the best interests of her child." In re Custody of Osborne, 119

Wn. App. 133, 144, 79 P.3d 465 (2003).

We review a trial court's decision to deny relocation for an abuse of

discretion. Horner, 151 Wn.2d at 893. "Abuse of discretion occurs 'when the trial

court's decision is manifestly unreasonable or based upon untenable grounds or

reasons.'" Horner, 151 Wn.2d at 893 (quoting State v. Brown, 132 Wn.2d 529,

572, 940 P.2d 546 (1997)). "A court's decision is manifestly unreasonable if it is

outside the range of acceptable choices, given the facts and the applicable legal

standard." In re Marriage of Littlefield, 133 Wn.2d 39, 47, 940 P.2d 1362 (1997).

"[I]t is based on untenable grounds if the factual findings are unsupported by the

record." Littlefield, 133 Wn.2d at 47. And "it is based on untenable reasons if it

is based on an incorrect standard or the facts do not meet the requirements of

the correct standard." Littlefield, 133 Wn.2d at 47. Where the trial court has

weighed the evidence, "[w]e do not review credibility determinations or reweigh

the evidence to determine if we should reach a different conclusion." McNaught,

189 Wn. App. at 561. Rather, "[w]e will reverse a trial court's factual findings only

if they are unsupported by substantial evidence," i.e., "'evidence of sufficient

quantity to persuade a fair-minded, rational person of the truth of the declared

10

premise.'" In re Marriage of Raskob, 183 Wn. App. 503, 510 & n.7, 334 P.3d 30 (2014) (quoting Bering v. SHARE, 106 Wn.2d 212, 220, 721 P.2d 918 (1986), cert. dismissed, 479 US. 1050 (1987)). To that end, we are not bound by the trial court's findings if the trial court "rejects uncontroverted credible evidence, or capriciously disbelieves uncontradicted evidence." Smith v. Pac. Pools, Inc., 12 Wn. App. 578, 582, 530 P.2d 658 (1975).

Here, reversal is required because the trial court's decision to deny relocation was an abuse of discretion. Specifically, the court failed to apply the statutory presumption in favor of relocation and improperly engaged in a best-interests-of-the-child analysis instead of weighing the detriment of relocation against the presumed benefits to P.J.M. and McKinley. Additionally, the trial court's errors pervade its findings regarding the individual relocation factors such that if the trial court had applied the correct legal standards, relocation should have been permitted. Each of these issues is discussed in turn below.

*Application of Incorrect Standards*

As discussed, the CRA establishes a presumption that a child will be permitted to relocate with the parent with whom the child resides a majority of the time. Former RCW 26.09.430 (2000); RCW 26.09.520. Additionally, the CRA requires the court to consider the relocation factors with a view toward determining whether "the decision of a presumptively fit parent to relocate with the child . . . will in fact be *so harmful* to a child as to outweigh the *presumed benefits of relocation to the child and relocating parent*." In re Parentage of R.F.R., 122 Wn. App. 324, 332-33, 93 P.3d 951 (2004) (emphasis added). Thus,

11

"the standard for relocation decisions is not only the best interests of the child." Horner, 151 Wn.2d at 894. Indeed, it is error for a trial court *not* to consider the benefit of the change to the child *and the relocating parent*. Horner, 151 Wn.2d at 894; RCW 26.09.520.

Here, it is undisputed that at the time of trial, McKinley was the person with whom P.J.M. resided a majority of the time: Under the parenting plan then in effect, P.J.M. spent time with Porter only on weekends and one weeknight. Nevertheless, the court failed to apply the presumption, stating, "In this case, the Court will apply the rebuttable presumption set forth in RCW 26.09.520, *but weigh it somewhat less heavily* than the Court would in another case without a 50-50 plan having been ordered." (Emphasis added.) The court reasoned that "[t]here is no case law on how to weigh [the] presumption when a 50-50 parenting plan is ordered to be implemented in the future" and that "[t]he incentive for gamesmanship in this setting is considerable." But the plain language of the CRA requires the court to apply the presumption in favor of relocation to "'a person with whom the child resides a majority of the time.'" See In re Marriage of Snider, 6 Wn. App. 2d 310, 317, 430 P.3d 726 (2018) (holding that in a 50-50 residential schedule, neither parent is entitled to the presumption because neither parent is "'a person with whom the child resides a majority of the time'" (quoting former RCW 26.09.430)). By weighing the presumption "somewhat less heavily" than it would in other cases where the primary residential parent seeks to relocate, the court applied a legal standard contrary to

12

the one mandated by the CRA. This was reversible error.

Porter argues that it was within the trial court's discretion to weigh the presumption less heavily to address "[t]he incentive to game the system and relocate just to avoid the 50/50 plan." But because a trial court does not have discretion to apply an incorrect legal standard, this argument fails. See Kreidler v. Cascade Nat'l Ins. Co., 179 Wn. App. 851, 866, 321 P.3d 281 (2014) (trial court necessarily abuses its discretion by applying an incorrect legal standard). Moreover, one of the relocation factors already directs the court to consider "[t]he reasons of each person for seeking or opposing the relocation and the good faith of each of the parties in requesting or opposing the relocation." RCW 26.09.520(5). And as discussed, the relocation factors are expressly "not weighted." RCW 26.09.520. In other words, the legislature already addressed the risk of gamesmanship in one of the relocation factors and decided that it should not be permitted to "trump" any of the other factors. But by weighing the presumption "somewhat less heavily" to address potential gamesmanship, the trial court allowed it to do just that. Porter's argument is not persuasive.

The trial court also abused its discretion by conducting its relocation analysis with the goal of honoring the originally contemplated, but not yet in effect, 50-50 parenting plan. Specifically, the trial court's own statements toward the conclusion of trial reveal that its subjective intent was to honor the originally contemplated 50-50 parenting plan. For example, the court stated:

> Right, I mean, the way I'm thinking about this . . . is—*is there a way that I can honor the 50/50 plan? Is there a solution I can come up with that would allow 50/50 to happen?* As it is currently set up, I can't imagine that we could do 50/50, but is there something else?

13

So, that's kind of what I'm pondering.

(Emphasis added.)

The court also stated:

> I'm pondering all kinds of creative things and what I'm struggling with is how few options I have been left. *And, that I am concerned that it's very difficult to honor the goal of a 50/50 Parenting Plan, given how few options I have.* And I'm thinking about spending some time generating some new options.

(Emphasis added.)

Shortly thereafter, the court stated:

> I feel like I ought to have a little bit more authority over the whereabouts of Ms. McKinley and re-looking at that *where [a] 50/50 plan was so contemplated by the Court than I would in a normal relocation case.* So, that's kind of the legal basis I'm thinking about.

(Emphasis added.)

The court also stated:

> I think you can tell from my questions that I'm trying to come up with a way of doing this that might not just be a yes or no to relocation. *And the reason I'm thinking about that is the intention of moving to a 50/50 plan.*
> . . . *I feel like there's got to be some way to try to honor that 50/50 plan.* If we were talking about, you know, moving across the country that's just not—I mean, that's just a yes or a no. But, here we have a little bit more wiggle room.

(Emphasis added.)

Additionally, when reciting its oral findings, the court stated, "Okay. So I really want you guys to be able to parent this child 50/50 if we can make it happen. Okay?" And in its written findings, the trial court wrote that "[t]his Court believes every effort should be made to make a 50-50 plan work." To that end, the trial judge even engaged in her own independent efforts to force a 50-50 plan

14

into fruition by reaching out to her contacts at the King County Department of Public Defense (DPD) about job openings and suggesting that McKinley follow up with DPD. Finally, after considering the relocation factors, the trial court concluded that "the Court believes it would be *in the child's best interests* for the mother to return to King County and for the parties to share residential time with him 50-50." (Emphasis added.) In short, it is beyond dispute that the trial court's paramount consideration was to honor the originally contemplated prospective 50-50 plan.

But while the standard by which a trial court establishes a parenting plan is the best interests of the child, In re Marriage of Possinger, 105 Wn. App. 326, 335, 19 P.3d 1109 (2001), that is *not* the correct standard for a relocation analysis. Horner, 151 Wn.2d at 894. By deciding relocation with the goal of "getting to 50-50," the court improperly placed its primary focus on P.J.M.'s best interests.

*Analysis of Relocation Factors*

As discussed, the trial court erred by failing to apply the presumption and by conducting its analysis through a best-interest-of-the-child lens rather than by requiring Porter to prove that McKinley's decision to relocate with P.J.M. "will in fact be so harmful to [P.J.M.] as to outweigh the presumed benefits of relocation" to P.J.M. and McKinley. R.F.R., 122 Wn. App. at 332-33. As further discussed below on a factor-by-factor basis,[5] the trial court's errors pervade its findings with

---

[5] We do not address factors 2 or 4 because Porter does not provide argument with regard to those factors, and we do not address factor 11 because it applies only to temporary orders.

regard to the relocation factors. Specifically, the record reveals that the trial court at various times ignored evidence, improperly shifted the burden of proof to McKinley, mischaracterized Sommer's testimony, improperly considered McKinley's reproductive choices, and failed to consider the "[p]articularly important . . . interests and circumstances of the relocating person." Horner, 151 Wn.2d at 894. Therefore, reversal is required.

### Relocation Factor 1

Under the first relocation factor, the trial court was required to consider "[t]he relative strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, siblings, and other significant persons in the child's life." RCW 26.09.520(1).

With regard to this factor, the trial court found that P.J.M. "has strong, stable relationships with both parents" and "has siblings in both households who love him." It then found that this factor "weighs equally for both parents." McKinley argues that had the court properly applied the presumption, this factor would have favored relocation. We agree for two reasons.

First, the trial court's finding that the first factor weighs equally for both Porter and McKinley ignores the undisputed evidence that Porter was absent from P.J.M.'s life from the time he was born until he was 16 months old. It also ignores the undisputed fact that although Porter's involvement with P.J.M. would gradually increase, at the time of trial P.J.M. spent less than 20 percent of his time with Porter. In other words, substantial evidence does not support a finding that the first relocation factor, which requires the court to consider the *relative*

16

strength, nature, quality, extent of involvement, and stability of the child's relationship with each parent, weighs equally for both parents.

Second, in the relocation context, the burden of production and the burden of persuasion are on the party opposing relocation—here, Porter. McNaught, 189 Wn. App. at 556. And again, the first relocation factor requires the court to consider the *relative* strength of the child's relationship with each parent, siblings, and other significant persons in the child's life. That the trial court found that P.J.M. has strong relationships with *both* parents and siblings in *both* households necessarily means that this factor does nothing to rebut the presumption in favor of relocation. Put another way, the court's finding that the first relocation factor weighs "equally" for both parents—despite the fact that P.J.M. has strong relationships in *both* households—confirms that the court failed to take into consideration the presumption that allows McKinley to relocate with P.J.M.

Porter argues that because McKinley did not challenge the trial court's findings with regard to the first relocation factor, they are verities on appeal. But we have the discretion to "review findings to which the appellant fails to properly assign error as long as the appellant has identified those findings and the nature of his challenges to them elsewhere in the brief." Bircumshaw v. State, 194 Wn. App. 176, 199, 380 P.3d 524 (2016). And here, McKinley fully advises the court that she takes issue with the court's findings with regard to the first relocation factor, and the reasons why. Therefore, we are not persuaded by Porter's argument.

Porter next argues that there was sufficient evidence to support the trial

court's finding that P.J.M. had a strong and stable relationship with Porter and his family. But as discussed, in considering this factor, the trial court failed to consider the *relative* strength and stability of P.J.M.'s relationships in each household. The cited evidence regarding P.J.M.'s relationships in *Porter's* household does not persuade us that the trial court properly considered this factor.

Porter also argues, as a general matter, that the presumption "does not require initially weighing each individual statutory factor in favor of the relocating party" and that "[c]onsideration of the factors is distinguished from the presumption." He cites McNaught in support of his arguments, pointing out that in McNaught, this court stated that the presumption "provides the standard the trial court uses *at the conclusion of trial* to resolve competing claims about relocation." McNaught, 189 Wn. App. at 556 (emphasis added). But Porter's argument ignores the CRA's express language stating that the party objecting to relocation "may rebut the presumption by demonstrating that the detrimental effect of the relocation outweighs the benefit of the change to the child and the relocating person, *based upon the [relocation] factors*." RCW 26.09.520 (emphasis added). This means that if a particular relocation factor is neutral (as the trial court found that the first factor was), it necessarily does nothing to rebut the presumption and thus favors relocation. Furthermore, the cited statement from McNaught was made in the context of rejecting an argument that the CRA's presumption disappears when the party objecting to relocation produces evidence. McNaught, 189 Wn. App. at 555-56. McNaught does not directly

address how the presumption should be applied when considering individual

relocation factors and does not support Porter's argument.

Moreover, even if we were to agree with Porter that the presumption is

applied not while but only *after* considering the relocation factors, the trial court

here failed to do even that. Specifically, in the "Conclusion" section of its findings

of fact and conclusions of law, the trial court wrote:

> The Court finds that it would be more detrimental for the
> child's relationship with his father to be disrupted than for his
> relationship with his mother to be disrupted as long as the child has
> frequent, meaningful contact with the mother. However, the Court
> believes it would be in the child's best interests for the mother to
> return to King County and for the parties to share residential time
> with him 50-50.

In other words, the trial court did not, as the CRA requires it to do, resolve the

parties' competing claims about relocation by applying the presumption in favor

of relocation. Rather, it resolved the parties' competing claims based on what it

"believe[d]" to be in P.J.M.'s best interests and by reemphasizing its finding

regarding just one of the relocation factors.[6] Porter's argument is unpersuasive.

Porter next argues, relying on *expressio unius est exclusio alterius*,[7] that

because two of the relocation factors already encompass a presumption in favor

---

[6] See former RCW 26.09.520(3) (requiring the court to consider "[w]hether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than disrupting contact between the child and the person objecting to the relocation").

[7] *Expressio unius est exclusio alterius* is a maxim of statutory construction, stating that when "'a statute specifically designates the things or classes of things upon which it operates, an inference arises in law that all things or classes of things omitted from it were intentionally omitted by the legislature.'" State v. Swanson, 116 Wn. App. 67, 75, 65 P.3d 343 (2003) (quoting Wash. Natural Gas Co. v. Pub. Util. Dist. No. 1, 77 Wn.2d 94, 98, 459 P.2d 633 (1969)).

of the relocating parent, the legislature intended the other factors—including the first—*not* to encompass such a presumption. He points out, for example, that the third factor directs the court to consider whether disrupting the child's contact with the relocating parent would be *more* detrimental than disrupting the child's contact with the nonrelocating parent. But in Horner, our Supreme Court observed that the consideration of all of the relocation factors "is logical because *they serve as a balancing test* between many important and competing interests and circumstances involved in relocation matters." Horner, 151 Wn.2d at 894 (emphasis added). The court went on to emphasize: "*Particularly important in this regard* are the interests and circumstances of the relocating person." Horner, 151 Wn.2d at 894 (emphasis added). The court thus held that consideration of each relocation factor is required to "ensure that trial courts consider the interests of the child and the relocating person *within the context of the competing interests and circumstances required by the CRA.*" Horner, 151 Wn.2d at 895 (emphasis added). It follows, from the central role that the relocation factors play in ensuring that the court considers the "[p]articularly important" interests and circumstances of the relocating person, Horner, 151 Wn.2d at 894, that the factors must be viewed with the presumption in mind. Therefore, Porter's argument is not persuasive.

## Relocation Factor 3

Under the third relocation factor, the court must consider "[w]hether disrupting the contact between the child and the person with whom the child resides a majority of the time would be more detrimental to the child than

disrupting contact between the child and the person objecting to the relocation." Former RCW 26.09.520(3) (2000). As further discussed below, the trial court's analysis of this factor—and the weight that it placed on it—confirms that the trial court failed to apply the presumption and based its relocation decision on the best interests of the child.

The court began its analysis of the third relocation factor with the observation that "[i]t is clearly not feasible to implement a 50-50 parenting plan between Bellevue and University Place once [P.J.M.] starts school. . . . *Therefore, the Court has to consider whether it would be better for [P.J.M.] to spend less time with his mother and more time with his father, or vice versa.*" (Emphasis added.) But by basing its analysis on what would happen when P.J.M. started school, the trial court ignored the fact that at the time of trial, P.J.M. resided primarily with McKinley, except a weekly Thursday overnight and an alternating Saturday overnight or Sunday visit with Porter. It also ignored the fact that McKinley was not proposing to relocate P.J.M. out of or across the state, where P.J.M.'s contact with Porter would necessarily and immediately be disrupted by relocation. Rather, under the residential schedule in force at the time of trial, any disruption to P.J.M.'s contact with his parents would simply consist of more time being spent in the car traveling between Bellevue and University Place. And even the trial court itself recognized that "I think the point that kids do actually talk to you in the car is really important to consider." In short, the court's analysis of the third relocation factor began in the wrong place, i.e., by making "every effort . . . to make a 50-50 plan work." As a result, the trial

21

court ignored the evidence by analyzing the third relocation factor solely through the lens of an anticipated *future* 50-50 plan rather than the family's *actual* circumstances.

To that end, and as Porter acknowledges, the trial court relied in part on Dr. Wheeler's assessment in analyzing this relocation factor. Dr. Wheeler testified that her assessment of this factor focused not on the circumstances as they existed at the time of trial, but on the anticipated future 50-50 plan that she had previously recommended during the parentage proceeding. Specifically, in describing her analysis, Dr. Wheeler began by explaining:

> So the plan as it was entered in the court, with the court, was for P.J.[M.] to be moving towards a 50/50 schedule with both of his parents. And in my opinion that was going to be in his best interests given that he has two very skilled, very competent, very loving parents, and a strong relationship with both of them.
> So had mother not relocated, that would have been P.J.[M.]'s future. So no matter what, that 50/50 arrangement is going to be disrupted because that's not going to make sense for him moving forward with parents living as far apart as Tacoma and Bellevue. So I provided an analysis of my thoughts on—or my opinions about disrupting contact with mother, as well as an analysis about my opinion about disrupting contact with father.

In other words, Dr. Wheeler analyzed this factor through the incorrect lens, i.e., based on the anticipated 50-50 plan. To the extent that the trial court relied on Dr. Wheeler's analysis, it repeated this error.

Furthermore, the trial court's emphasis on the third relocation factor confirms that its ultimate decision on relocation focused on "getting to 50-50" and thus, by extension, on what it believed would be in P.J.M.'s best interests. Specifically, in its oral ruling, the trial court stated that the third relocation factor "is really where the rubber meets the road." And after conducting its analysis of

each factor in its written findings, the trial court expressly discussed the third factor in its conclusion, stating, "The Court finds that it would be more detrimental for the child's relationship with his father to be disrupted than for his relationship with his mother to be disrupted as long as the child has frequent, meaningful contact with the mother." Put another way, the trial court's emphasis on the third relocation factor confirms that it failed to apply the presumption in favor of relocation or give due consideration to the interests of the relocating party, McKinley.

Porter argues that because McKinley did not challenge the trial court's finding that a 50-50 parenting plan is not feasible between Bellevue and University Place or its finding that "every effort should be made to make a 50-50 plan work," these findings are verities on appeal. But this argument is unpersuasive because it fails to acknowledge, as discussed above, that the anticipated future 50-50 plan was not the proper focus of the trial court's analysis.

Porter next points out that the trial court made a finding that "[i]t would be a terrible loss for [P.J.M.] not to have the opportunity to grow up at least half the time with a highly skilled, experienced parent" and argues that sufficient evidence supports this finding. But this argument is unpersuasive for a number of reasons. First, it again fails to acknowledge that the trial court improperly focused its analysis on a future 50-50 plan. Second, it fails to address the fact that the trial court placed substantial weight on the third relocation factor, thus confirming that the trial court's relocation decision was based on what it believed would be in P.J.M.'s best interests. Third, Porter's argument ignores that arguably nearly

23

*every* relocation results in a disruption to the child's contact with one of the parents. Therefore, that the relocation will result in a disruption to the child's contact with a skilled parent does not alone support a finding that the third relocation factor weighs against relocation.

Finally, the trial court relied on inadmissible hearsay when making its finding. Specifically, the trial court referred at length to comments that Rasmussen made to Dr. Wheeler regarding "the lack of structure in [McKinley's] home." Under ER 703, an expert may base her opinion on facts that are not otherwise admissible if they are "of a type reasonably relied on by experts in the particular field." In re Det. of Leck, 180 Wn. App. 492, 513, 334 P.3d 1109 (2014). But the rule does not permit the fact finder, here the trial court, to consider those inadmissible facts for the truth of the matter asserted. Porter argues that the trial court properly admitted Rasmussen's claims under ER 703 and that the court did not recite the hearsay evidence as a fact or a finding but only to recognize the information that Dr. Wheeler properly considered in forming her opinion. But this argument is unconvincing where the trial court's hearsay-based description of the conditions in McKinley's home was immediately followed by a finding that Porter's home "is a stark contrast." To that end, the trial court's characterization of Porter's home as a "stark contrast" also is not supported by substantial evidence: Dr. Wheeler, the only witness who testified to spending time in both homes, wrote in her report that "[b]oth homes were clean and well-organized, and child friendly" and that "[n]o significant environmental concerns were apparent in either home." In short, the trial court's finding with regard to the

24

relative state of both homes is not supported by substantial evidence.

Porter also points out that "there was testimony that called into question the stability of Ms. McKinley's relationships and living situation, as well as testimony that called into question her decision-making abilities." Specifically, Porter points to Dr. Wheeler's testimony that McKinley has "had a number of jobs just since the last evaluation, a number of residences since the last evaluation." But to the extent that the trial court relied on this testimony to conclude that McKinley is unstable, it ignored its *own* finding that Dr. Wheeler failed to appreciate either "the reasons a law student/new lawyer and single mother of two might move frequently or struggle to find work" or "the nature of contract lawyer work." Put another way, the fact that McKinley changed residences and employment in reaction to past life circumstances does not support a finding of future instability.

Additionally, the trial court's concerns regarding McKinley's stability and decision-making abilities were based in part on being "taken aback" by Mr. Sommer's testimony that he and McKinley conceived a baby when they "just decided to throw caution to the wind." But the trial court's characterization of Sommer's testimony is not supported by the record: Sommer testified that he wanted McKinley to get pregnant if it happened spontaneously, and McKinley testified that she "thought that it was a good idea to have a baby with a man who has been consistent and stable and involved and who . . . loves me." This testimony does not support the trial court's characterization that the couple "thr[e]w caution to the wind." In any event, McKinley and Sommer's reproductive

choice simply is not a relevant consideration with regard to McKinley's "stability, maturity, or . . . long term thinking," much less whether relocation should be permitted.

Porter attempts to justify the trial court's finding in his answer to amicus Legal Voice's brief.[8] He argues that

> [a]s an example of Ms. McKinley's instability, the court noted that as a single mother with two young sons who was struggling financially, Ms. McKinley's decision to "throw caution to the wind," was not a sign of stability, maturity, or good long term thinking— some of the contested issues in this case.

But as discussed, the record does not support a finding that McKinley "thr[e]w caution to the wind," and McKinley's and Sommer's decision to have a baby together is not a relevant consideration with regard to McKinley's stability, maturity, or long-term thinking. Porter's argument is unpersuasive.

In short, the trial court's findings regarding the third relocation factor improperly focused on what it perceived to be in P.J.M.'s best interests, and the court's emphasis on this factor confirms that its relocation decision was based on the child's best interests.

### Relocation Factor 5

The fifth relocation factor directs the court to consider "[t]he reasons of each person for seeking or opposing the relocation and the good faith of each of

---

[8] We do not consider Porter's remaining arguments in his answer to Legal Voice's amicus brief because those arguments are not addressed to new matters raised in Legal Voice's brief. Instead, they address arguments raised in McKinley's opening brief, to which Porter already had an opportunity to respond. See RAP 10.3(f) ("The brief in answer to a brief of amicus curiae should be limited solely to the new matters raised in the brief of amicus curiae.").

the parties in requesting or opposing the relocation." RCW 26.09.520(5).

The trial court found that McKinley's initial move to University Place was not made in bad faith because she "*had* to move, immediately, and she needed to find a less expensive place to live." But it also found that McKinley's "decision to buy a home with her boyfriend before this trial had reached its conclusion" *was* in bad faith. Specifically, the court observed that "[t]his was unnecessary and a slap in the face to the process and the father's role in [P.J.M.]'s life." It found that McKinley "could have rented month to month, or sough[t] a leasehold shorter than one year, to learn the outcome of this proceeding."

But this finding ignores the evidence. Specifically, McKinley testified that she and Sommer had intended to move in together for a while, explaining, "we are a family and right now we're having to be a split family." McKinley also testified that she would not qualify for state medical insurance for much longer, and the only way to get on Sommer's insurance before their baby was born in September was to live together. This left McKinley and Sommer with the choice either to move into another temporary living situation or to find a more permanent place to live. To this end, Sommer testified, with regard to the decision to buy a house, that McKinley's apartment lease had expired in June, and although she could have gone month-to-month, "it was a ridiculous rate." He also explained that with McKinley due in September, he and McKinley did not want to hold off any longer on their plans to buy a house: "I'd rather get into a house, get it set up the way I want it so that when my kid arrives it's nice and comfy." Sommer testified that he and McKinley "look[ed] around a lot" for houses, and that the one

27

they ultimately bought was "kind of a . . . diamond in the rough." Even the court observed that "[t]he testimony portrayed this house as very special and ideal for three children." In short, substantial evidence does not support the trial court's finding that McKinley's decision to buy a house with her partner was in bad faith. Cf. Smith, 12 Wn. App. at 582 (appellate court not bound by findings if trial court capriciously disbelieves uncontradicted evidence).

Porter argues that the court reasonably found that McKinley's decision to buy a house was in bad faith. He points out that although Sommer worked in Seattle, he and McKinley did not look for homes to purchase or rent in King County. He also points out that the trial court observed that Sommer "admitted that [he and McKinley] had not really discussed P.J.M.'s parenting plan when they talked about buying a house":

> When the Court outlined how much driving would need to be done during the work day, [Sommer's] face revealed to the Court that he had absolutely no idea what it would take to implement the parenting plan. This illustrates that the mother did not treat the trial court's parenting plan as a document she needed to follow both to the letter and in the spirit of co-parenting her son.

But the trial court's questioning of Sommer in this regard focused on whether or not he and McKinley had sufficiently considered how a 50-50 plan would work once P.J.M. began school. One portion of the court's dialog with Sommer is particularly revealing: When the court commented that it sounded like the "specifics" of the future 50-50 plan weren't "really part of the discussion[,]" Sommer explained, "I mean it can't be. If you have to find a place to live, you have to find a place to live, so . . . ." The court responded, "Right. But if you have to move to a 50/50 Parenting Plan, you have to move for a 50/50 Parenting

28

Plan that is reasonable." This colloquy reveals that the court expected McKinley to elevate P.J.M.'s anticipated 50-50 plan above the considerations of her partner and their growing family. But this is not what the CRA requires. See Horner, 151 Wn.2d at 894 ("Particularly important" with regard to the consideration of the relocation factors "are the interests and circumstances of the relocating person."). To this end, Sommer explained that he and McKinley did not consider rentals because he and McKinley considered buying a home a "wise financial decision," and although Sommer would have liked to purchase closer to Seattle, "it kind of made sense for us to move where we could afford to live comfortably."

In short, to the extent that the trial court was concerned about gamesmanship—i.e., that McKinley purchased a home in University Place to avoid a future 50-50 plan—that concern is not supported by the record. Rather, the record reflects that the trial court based its finding not on actual evidence of gamesmanship, but on a concern about *potential* gamesmanship. The trial court found that McKinley *had* to move to the Tacoma area, immediately. It found that McKinley "needed to find a less expensive place to live" and that "[s]he had been offered a good job in Olympia and it made sense to find a home equidistant between Bellevue and Olympia." But despite the trial court's findings regarding McKinley's reasons for moving and McKinley's and Porter's testimony regarding their reasons for purchasing a home together, the trial court found that the fifth relocation factor weighed in Porter's favor, citing alternatives that McKinley "could have" chosen but did not. By basing its finding of bad faith on alternatives to homeownership that McKinley "could have" pursued and ignoring McKinley's and

29

Sommer's compelling reasons for choosing homeownership, the trial court essentially placed the burden on McKinley to prove that she did *not* act in bad faith. But Porter bears the burden of production and the burden of persuasion in the relocation context. Therefore, the trial court erred. Indeed, this error was further compounded by the fact that potential gamesmanship was a weighty concern to the trial court, which specifically cited the "incentive for gamesmanship" as a reason to weigh the presumption "somewhat less heavily" in this case.

Moreover, the trial court's reasoning that McKinley could have, or should have, put her homeownership plans on hold to learn the outcome of the relocation trial violates RCW 26.09.530, which prohibits the court from considering "evidence on the issue of whether the person seeking to relocate the child will forego his or her own relocation if the child's relocation is not permitted." Indeed, the court essentially *assumed* that McKinley would move back—or would at least consider moving back—if P.J.M.'s relocation was not permitted. But this is exactly the type of consideration that RCW 26.09.530 prohibits.

Porter contends that McKinley's argument that the trial court improperly considered evidence prohibited by RCW 26.09.530 is "strained." He argues that the court "simply observed that she purchased a permanent and costly home with flagrant disregard to the outcome of the proceedings when she could have waited and made a more informed decision regarding where she wanted to live— be it in University Place or King County." But Porter's argument merely underscores that the trial court improperly considered "the issue of whether the

30

person seeking to relocate the child will forego his or her own relocation if the child's relocation is not permitted." RCW 26.09.530.

In considering the fifth relocation factor, the court ignored evidence, considered issues in violation of RCW 26.09.530, applied a best-interests-of-the-child lens by centering its focus on the anticipated 50-50 plan, and improperly shifted the burden to McKinley to prove that she did not act in bad faith.

<u>Relocation Factor 6</u>

Under the sixth relocation factor, the court considers "[t]he age, developmental stage, and needs of the child, and the likely impact the relocation or its prevention will have on the child's physical, educational, and emotional development, taking into consideration any special needs of the child." RCW 26.09.520(6). Here, again, the trial court's findings reveal that it ignored evidence and based its findings on what it believed was in P.J.M.'s best interests.

Specifically, the trial court found that P.J.M. "is reaching the end of the window of time where he needs to have a consistent relationship with a primary caregiver." It also found that "at the moment both parents are equally able to manage [P.J.M.]'s developmental stage." And Dr. Wheeler concluded that this factor weighed equally between the parents. Nevertheless, the trial court disagreed with Dr. Wheeler and found that this factor weighed "modestly in favor of the father," reasoning: "This Court looks ahead one year, to Kindergarten, *and questions whether* the mother's parenting style (as described by [B.R.]'s father and step-mother) will be as well adapted to [P.J.M.]'s developmental needs as the father's." (Emphasis added.) But in light of the CRA's "apparent purpose of

generally favoring relocation," McNaught, 189 Wn. App. at 556, the trial court's hearsay-based speculation is not alone sufficient to find that this factor weighs against relocation.

Furthermore, the trial court's analysis did not directly address the focus of this relocation factor—i.e., the impact of the relocation. Instead, the court engaged in something akin to a parenting plan modification analysis, asking which parent P.J.M. should live with. But the court must first decide whether to permit or restrain location, applying the CRA's statutory presumption in favor of relocation, before determining what, if any, modifications should be made to the parenting plan as a result of the decision on relocation. RCW 26.09.260(6). Here, the trial court "put the cart before the horse" by going directly to the modification analysis.

Porter argues that the portion of the trial court's finding stating that "[t]his factor weighs modestly in favor of the father" is unchallenged and therefore a verity on appeal. But McKinley's brief fully advises the court that she takes issue with the court's finding that the sixth relocation factor weighed in Porter's favor, and the reasons why. Therefore, Porter's argument is unpersuasive.

Porter next argues that McKinley "misconstrues the court's finding and analysis and ignores that the plain language of the factor necessarily requires a consideration of the impact relocation would have on the child's future." But this argument fails to recognize that the trial court's findings regarding the impact of the relocation were based on speculation. Porter's argument is unpersuasive.

Relocation Factor 7

The seventh relocation factor directs the court to consider "[t]he quality of life, resources, and opportunities available to the child and to the relocating party in the current and proposed geographic locations." RCW 26.09.520(7). McKinley argues that the trial court misapplied this factor by turning it into a contest between Porter's household and McKinley's household rather than considering the quality of life, resources, and opportunities available to P.J.M. and McKinley in the Bellevue area versus the Tacoma area. We agree.

Specifically, the trial court began by observing that Porter's home "offers a very high quality of life and more resources than the mother's," but also that "[t]he mother's new home sounds lovely, and it is quite possible that materially [P.J.M.] might be equally or close to equally well off in either home." The court also observed that at Porter's home, P.J.M. "has three older siblings who adore him" and that at McKinley's home, "he has a brother he has known his whole life and will soon have a baby brother or sister." The trial court nonetheless found that this factor weighed in Porter's favor, observing that "[i]t is just not clear what will happen in the mother's relationship with the boyfriend, without whom she could not live in the house" and that "[B.R.] has already begun to exhibit some learning/behavioral issues" and "[t]here will be a big adjustment when the baby arrives." But none of these countervailing observations has anything to do with the relevant focus under this factor, i.e., the current versus proposed *geographic locations*. RCW 26.09.520(7); cf. In re Marriage of Grigsby, 112 Wn. App. 1, 12-13, 57 P.3d 1166 (2002) (holding that trial court properly analyzed seventh

33

relocation factor by considering activities available on Whidbey Island with "what Dallas had to offer").

Porter argues that because McKinley did not specifically challenge the trial court's finding that the seventh relocation factor weighs in Porter's favor, that finding is a verity on appeal. But again, this court has the discretion to "review findings to which the appellant fails to properly assign error as long as the appellant has identified those findings and the nature of his challenges to them elsewhere in the brief." Bircumshaw, 194 Wn. App. at 199. Porter's argument is unpersuasive.

Porter next argues that the trial court's finding that the seventh factor weighs in his favor is supported by substantial evidence because the trial court "noted that the opportunities and quality of life improvements for Ms. McKinley were potentially not permanent." But the trial court's observation about permanence reached beyond the scope of the inquiry for this relocation factor because it does not negate the benefits that the "proposed geographic location" (the Tacoma area) offers. Furthermore, the trial court's observations about permanence were based not on evidence in the record, but on pessimistic speculation about the future of McKinley's relationship with "the boyfriend." Indeed, Porter points to no evidence in the record that supports a finding that McKinley's relationship with Sommers was unstable or any more likely to end than any other relationship. Therefore, Porter's argument is unpersuasive.

Relocation Factor 8

The eighth relocation factor directs the court to consider "[t]he availability

of alternative arrangements to foster and continue the child's relationship with and access to the other parent." RCW 26.09.520(8). With regard to this factor, the trial court found:

> Tacoma may be too far for a 50-50 parenting plan, but it is close enough that he could have frequent, meaningful access to his father.
> At the moment, it is not possible for the father and [P.J.M.] to talk on the phone or to Skype given the mother's refusal to share contact information. Of course, [P.J.M.] could call his father as long as his mother would assist.
> Given the mother's attitude about sharing phone information with the father and her consistent efforts to marginalize him, the Court is not convinced that the mother would implement consistently alternative arrangements for [P.J.M.] to communicate with his father.

In other words, while the court found that alternative arrangements were in fact available, it was unconvinced that McKinley would actually utilize them. For the following reasons, the trial court's findings again reflect that it failed to apply the presumption in favor of relocation.

First, the trial court focused solely on access to technological solutions despite the fact that this is not a case of a parent relocating across or out of state, where technological solutions may be necessary to foster a relationship. Put another way, the trial court inexplicably ignored the fact that alternative arrangements, such as residential schedule modifications, can be made to ensure that P.J.M. continues to have meaningful access to Porter.

Second, to the extent that the court weighed the eighth factor against relocation, it impliedly found that despite the fact that alternative arrangements are *available*, McKinley will not utilize them. That finding, however, is speculative and not supported by substantial evidence. Porter asserts that there "was

35

testimony that Ms. McKinley did not allow [P.J.M.] to call Mr. Porter," but the portion of the record to which Porter cites to support this assertion consists of Dr. Wheeler relaying an "assumption" voiced by Laegreid that "maybe" P.J.M. was asking to call Porter while at McKinley's house and not being allowed to. Furthermore, the trial court's implicit finding ignores evidence that McKinley is in fact willing to implement alternative arrangements. Specifically, McKinley testified that she proposed that P.J.M. be given a "gizmo" device that could be used to call Porter. Indeed, by expressing that it was "not convinced" that McKinley would implement available alternative arrangements for P.J.M. to communicate with Porter, the court improperly shifted the burden of persuasion onto McKinley to prove that she *will* in fact implement available alternative arrangements to foster P.J.M.'s relationship with Porter. This, too, was error. Cf. McNaught, 189 Wn. App. 554 (rejecting argument that once nonrelocating parent produces sufficient evidence to overcome the presumption by a preponderance of the evidence, the presumption disappears and the court weighs the evidence without regard to the presumption).

Porter argues that the trial court's findings regarding the eighth relocation factor are supported by evidence that McKinley avoided communicating with Porter and devalued Porter as a parent. But the fact that McKinley herself avoided communicating with Porter does not support a finding that McKinley would prevent P.J.M. from calling Porter or vice versa. Therefore, Porter's argument is not persuasive.

36

## Relocation Factor 9

Under the ninth relocation factor, the court considers "[t]he alternatives to relocation and whether it is feasible and desirable for the other party to relocate also." With regard to this factor, the trial court found:

> The father has three older children who attend school in Bellevue. He shares a 50-50 residential schedule with their mother. He works at Microsoft and his parenting routine depends on getting home early enough to manage homework. It is not feasible for him to relocate.
> The mother is doing contract public defense work. She could do this work or something similar in King County or Snohomish County. She and Mr. Sommer are apparently able to swing a $2800/month mortgage. This would cover rent in Bellevue. The Court understands that under the circumstances, and with a baby arriving in September, it is not possible for the mother to relocate back to the Seattle-Bellevue area immediately. However, over the course of the next year she could find a job or a contract position and housing.
> The Court's orders will allow a year for this transition.

McKinley argues that "[t]he court glaringly failed to apply the presumption to the alternatives to relocation," and we agree. Specifically, the court was extremely deferential to Porter's status quo, summarily finding that it was not feasible for Porter to relocate based on his 50-50 parenting arrangement with Erin, his current job, and his "parenting routine." But the court just as summarily concluded that alternatives to relocation *would* be feasible for McKinley *despite* her job in Pierce County and her growing family, and without any consideration for McKinley's parenting arrangement with Rasmussen. Again, the court's own order reveals why it gave less deference to McKinley's status quo than to Porter's: "[T]he Court believes it would be in the child's best interests for the mother to return to King County and for the parties to share residential time with

37

him 50-50." But as discussed, by prioritizing a future 50-50 arrangement over the presumed benefits of relocation, the trial court improperly focused its analysis on P.J.M.'s best interests rather than the presumed benefits of relocation to P.J.M. *and McKinley.*

Moreover, the court's finding that "over the course of the next year [McKinley] could find a job or a contract position and housing" in King County is entirely speculative. Indeed, even Porter cites to no support in the record for this proposition. The court's finding is also at odds with its earlier acknowledgment that McKinley "tried her best to stay [in her home in Bellevue] as she struggled to find a lawyer job in the Seattle/Bellevue area" and that "[i]t is not surprising to this Court that a new lawyer without connections in the legal field would have difficulty finding a job." In other words, the court's apparent finding that McKinley had alternatives to relocation not only ignored the statutory presumption but contradicted its other findings.

Porter argues that the trial court's finding on this factor was supported by substantial evidence. He points to the trial court's finding that McKinley could do contract public defense work in King County and that the $2,800 that Sommer and McKinley were spending on their mortgage payment would be sufficient to afford rent in King County. But again, the court's finding about McKinley's ability to find work in King County—and thus its finding that she and Sommer could afford $2,800 per month in rent—is speculative. Porter's argument fails.

<u>Relocation Factor 10</u>

The tenth relocation factor directs the court to consider "[t]he financial

impact and logistics of the relocation or its prevention." RCW 26.09.520(10). The record establishes that the trial court, which did not document its consideration of this factor, failed to consider it.

"When this court considers whether a trial court abused its discretion in failing to document its consideration of the child relocation factors, [it] will ask two questions." Horner, 151 Wn.2d at 896. First, "[d]id the trial court enter specific findings of fact on each factor? If not, was substantial evidence presented on each factor, and do the trial court's findings of fact and oral articulations reflect that it considered each factor?" Horner, 151 Wn.2d at 896. *"Only with such written documentation or oral articulations* can we be certain that the trial court properly considered the interests of the child *and the relocating person* within the context of the competing interests and circumstances required by the CRA." Horner, 151 Wn.2d at 896 (emphasis added).

Here, although the trial court entered enumerated findings for each of the other relocation factors, the court's written order omits any finding specific to the tenth relocation factor. The court made the same omission when it orally recited its findings, making specific findings regarding every single factor except the tenth. The only reasonable conclusion from these omissions is that the trial court failed to consider the tenth factor.

Porter argues that the trial court's findings indicate that it considered the tenth relocation factor. He points to the trial court's finding that McKinley faced economic challenges that were not appreciated by Dr. Wheeler and that necessitated McKinley's initial move to University Place. He also points to the

39

trial court's acknowledgment of the struggles of a recent law school graduate looking for work. And he argues that substantial evidence supports the trial court's finding that McKinley and Sommer pay approximately $2,800 per month on their mortgage and that this amount would be sufficient to pay for rent in King County. But these findings are not persuasive for two reasons.

First, as discussed, the fact that the trial court enumerated its findings with regard to *each factor except the tenth* indicates that the trial court failed to give due consideration to the tenth factor regardless of the findings cited by Porter.

Second, even the findings that Porter cites do not constitute full consideration of the tenth relocation factor. Although the trial court made findings as to the financial reasons for McKinley's relocation, it did not properly consider the financial impacts of *preventing* relocation. Indeed, as already discussed with regard to the ninth relocation factor, the trial court's finding that McKinley and Sommer could afford $2,800 per month for rent in King County is based on speculation that McKinley could secure a job in King County. It is also based on speculation that McKinley would continue to benefit from Sommer's income if she were to return to King County, which we note conflicts with the trial court's (also speculative) finding that "it isn't clear that [Sommer] will remain in Ms. McKinley's life long term."

Porter next argues that the trial court properly considered the logistics of the relocation, contending that "the logistics of the relocation—how a 50/50 parenting plan would work for a school-aged child with parents living in Bellevue and University Place—was the clear focus of the court's analysis, and the center

40

of the court's reasoning." But the proper focus of the tenth relocation factor is the logistics of the relocation itself, not the impact that the relocation would have on an anticipated future residential schedule. Indeed, the trial court's focus on "how a 50/50 parenting plan would work" only confirms that the court's analysis was based on what it perceived was in P.J.M.'s best interests.

*Conclusion*

The trial court erred by failing to apply the statutory presumption in favor of relocation, instead weighing the presumption "somewhat less heavily" than it would have in other cases. And the trial court's own findings and comments on the record establish that it conducted its relocation analysis with the subjective intent of honoring the originally contemplated 50-50 plan. As a result, the trial court necessarily and erroneously focused its analysis on what it perceived was in the best interests of the child, rather than by requiring Porter to prove that McKinley's decision to relocate with P.J.M. "will in fact be so harmful to [P.J.M.] as to outweigh the presumed benefits of relocation" to P.J.M. and McKinley. R.F.R., 122 Wn. App. at 332-33. These errors are borne out in the court's findings regarding the relocation factors, which reveal that the trial court at various times ignored evidence, relied on inadmissible hearsay, improperly shifted the burden of proof to McKinley, mischaracterized Sommer's testimony, improperly considered McKinley's reproductive choices, and failed to consider the "[p]articularly important . . . interests and circumstances of the relocating person." Horner, 151 Wn.2d at 894. As supported by the factor-by-factor analysis above, if the trial court had applied the correct standards, relocation

should have been permitted. Therefore, reversal is required.

SOLE DECISION-MAKING

McKinley argues that the trial court erred by allocating sole decision-making to Porter. We agree.

If, as here, one parent is opposed to mutual decision-making and that opposition is reasonable, the court must order sole decision-making. RCW 26.09.187(2)(b). Under RCW 26.09.187, in considering whether opposition to mutual decision-making is reasonable, the court "shall consider the following criteria":

> (i) The existence of a limitation under RCW 26.09.191;
> (ii) The history of participation of each parent in decision making in each of the areas in RCW 26.09.184(5)(a);
> (iii) Whether the parents have a demonstrated ability and desire to cooperate with one another in decision making in each of the areas in RCW 26.09.184(5)(a); and
> (iv) The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

RCW 26.09.187(2)(b)(iii), (c). This court reviews a trial court's decision regarding parental decision-making for an abuse of discretion. In re Marriage of Jensen-Branch, 78 Wn. App. 482, 490, 899 P.2d 803 (1995).

Here, the trial court stated that Porter's opposition to mutual decision-making was reasonable "because of the parents' lack of ability to cooperate with each other in decision-making as noted by the parenting evaluator in the parties' prior and current proceedings." In other words, the trial court only considered one of the factors in RCW 26.09.187(2)(c), i.e., "[w]hether the parents have a demonstrated ability and desire to cooperate with one another in decision making." RCW 26.09.187(2)(c)(iii). But the trial court "must consider" each of

42

the four factors set forth in that statute. Jensen-Branch, 78 Wn. App. at 489. By failing to do so, the trial court abused its discretion.

Porter argues that the trial court's order included the requisite findings. But as discussed, it does not. And Porter does not point to anything in the record indicating that the trial court actually considered the other three factors in allocating decision-making. See RAP 10.3(a)(6) (arguments must be accompanied by references to relevant parts of the record). Therefore, Porter's argument fails.

ATTORNEY FEES FOR MCKINLEY'S MOTION TO COMPEL

McKinley argues that the trial court erred by declining to impose sanctions against Porter in connection with McKinley's motion to compel the production of communications between Porter and Rasmussen's wife, Lindsay.[9] We consider this argument waived because McKinley raises it for the first time on appeal.

Specifically, at trial, McKinley's attorney cross-examined Porter as to why he did not produce a text message that he sent to Lindsay in response to McKinley's requests for production. Porter explained that he did not consider the text a "communication" because he was simply forwarding a message from B.R.'s dentist that apparently was sent to Porter by mistake. The court corrected Porter, explaining, "The forwarding of it, was communication between you and Lindsay." McKinley did not request sanctions at this point, nor does she point to anything in the record indicating that she ever asked for sanctions after it became

---

[9] Because Rasmussen and his wife share a common last name, we refer to Lindsay by her first name.

clear that Porter failed to produce the text message. Therefore, she waived this argument on appeal. RAP 2.5(a); see also Rapid Settlements, Ltd. v. Symetra Life Ins. Co., 166 Wn. App. 683, 695, 271 P.3d 925 (2012) (reason that appellate court generally will not entertain issues raised for first time on appeal "is to afford the trial court an opportunity to correct errors").

McKinley argues that CR 37 makes sanctions mandatory when a party fails to respond to discovery. But she points to no authority to support the proposition that the trial court is required to impose sanctions on a sua sponte basis without any request from a party. Therefore, her argument is unpersuasive.

## ATTORNEY FEES FOR MCKINLEY'S FAILURE TO FILE KING COUNTY LOCAL FAMILY LAW RULE 10 DOCUMENTS

McKinley argues that the trial court erred by awarding attorney fees to Porter as a sanction for McKinley's failure to timely file her LFLR 10 financial documents. We disagree.

A trial court's management of a trial, including its decision to impose sanctions for a party's failure to follow a pretrial scheduling order, is reviewed for abuse of discretion. Peluso v. Barton Auto Dealerships, Inc., 138 Wn. App. 65, 69, 155 P.3d 978 (2007).

Here, the trial court entered a pretrial order directing each party to file a financial declaration, along with all supporting documents required by LFLR 10, no later than three weeks before trial. Although McKinley provided the LFLR 10 documents to her attorney, her attorney failed to file them. The trial court did not find credible McKinley's attorney's explanation that the failure to file was a

mistake. Accordingly, the court asked Porter's counsel to prepare an attorney fee declaration, indicating that it planned to order McKinley's attorney to reimburse Porter for his reasonable attorney fees. Although Porter's attorney requested $3,982.50 in attorney fees, the trial court ordered sanctions of only $2,000.00.

The trial court's determination that McKinley's attorney was not credible cannot be disturbed on appeal. Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003). Furthermore, in determining the amount of sanctions, the trial court considered the circumstances as a whole, including the fact that McKinley's attorney provides low-cost services on a sliding-scale basis. For these reasons, the trial court did not abuse its discretion.

McKinley argues that there was no evidence to support the court's finding that McKinley's failure to file the LFLR 10 documents was strategic. But as discussed, this finding was based on a credibility determination and cannot be disturbed on appeal. Furthermore, McKinley cites no authority for the proposition that willfulness is a prerequisite to an imposition of monetary sanctions. Cf. Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 690, 132 P.3d 115 (2006) (Burnet[10] analysis, including consideration of willfulness, not applicable to monetary compensatory sanctions). McKinley's argument fails.

McKinley next asserts that her LFLR 10 documents were provided to Porter through counsel. But the part of the record that she cites establishes only that it was "not clear that all of the[ ] documents were presented to [Porter's

---

[10] Burnet v. Spokane Ambulance, 131 Wn.2d 484, 933 P.2d 1036 (1997).

45

attorney]." Therefore, this assertion is not persuasive.

Finally, McKinley argues that "the court compounded its error by assessing the amount of fees based [on] the fact that [McKinley] appealed the trial court's order and pursuant to a Response and Affidavit for Fees that are not part of the record." But Porter's attorney fee affidavit *was* made a part of the record, and the trial court considered it. And although the trial court did observe that McKinley had filed an appeal, the trial court made that observation while explaining why it was awarding only $2,000.00, rather than the entire $3,982.50 requested by Porter's attorney. We reject McKinley's arguments.

## ALLOCATION OF DR. WHEELER'S FEES

McKinley argues that the trial court erred by ordering her to pay 33.4 percent of Dr. Wheeler's fees, rather than allocating Dr. Wheeler's fees on a pro rata basis according to the parties' relative income as reflected in the court's child support order. We disagree.

Under RCW 26.09.140, a court may "from time to time after considering the financial resources of both parties . . . order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorneys' fees or other professional fees in connection therewith." RCW 26.09.140. "The decision to award fees is within the trial court's discretion." In re Marriage of Knight, 75 Wn. App. 721, 729, 880 P.2d 71 (1994). "The party challenging the award bears the burden of proving that the trial court exercised this discretion in a way that was clearly untenable or manifestly unreasonable." Knight, 75 Wn. App. at 729.

Here, McKinley fails to satisfy that burden. She argues that the court's allocation of Dr. Wheeler's fees conflicts with its oral ruling, pointing to the trial court's statement that "if we do proportionally [sic] sharing, we've got to use her real income." She also argues that the court's allocation "contravenes . . . the statute that requires the trial court to consider the financial circumstances of the parties."

But a trial court's oral ruling "'has no final or binding effect, unless formally incorporated into the findings, conclusions, and judgment.'" In re Det. of B.M., 7 Wn. App. 2d 70, 84, 432 P.3d 459 (internal quotation marks omitted) (quoting In re De Facto Parentage & Custody of M.J.M., 173 Wn. App. 227, 242 n.13, 294 P.3d 746 (2013)), review denied, 193 Wn.2d 1017 (2019). And even though the trial court originally ordered the parties to split Dr. Wheeler's fees evenly when it appointed her as parenting evaluator, it ultimately ordered McKinley to reimburse Porter for only 33.4 percent of Dr. Wheeler's fees. This reduction in McKinley's proportionate share indicates that the court *did* consider the parties' financial circumstances. McKinley's arguments fail.

MOTION FOR RECONSIDERATION

McKinley argues that the trial court erred by denying her motion for reconsideration, in which she asked the court to reconsider (1) its order denying relocation and (2) its allocation of Dr. Wheeler's fees. "Motions for reconsideration are addressed to the sound discretion of the trial court and a reviewing court will not reverse a trial court's ruling absent a showing of manifest abuse of discretion." Wilcox v. Lexington Eye Inst., 130 Wn. App. 234, 241, 122

47

P.3d 729 (2005).

Here, for reasons already discussed, the trial court did not abuse its discretion by denying reconsideration as to its allocation of Dr. Wheeler's fees. And because we reverse the trial court's decision on relocation, we do not consider whether the trial court erred by declining to reconsider that decision. See Wash. State Farm Bureau Fed'n v. Gregoire, 162 Wn.2d 284, 307, 174 P.3d 1142 (2007) ("'[I]f resolution of an issue effectively disposes of a case, we should resolve the case on that basis without reaching any other issues that might be presented.'" (internal quotation marks omitted) (quoting Hayden v. Mut. of Enumclaw Ins. Co., 141 Wn.2d 55, 68, 1 P.3d 1167 (2000))).

## FEES ON APPEAL

Both parties request fees on appeal. We grant McKinley's request and deny Porter's request.

Under RAP 18.1, we may award attorney fees if authorized by applicable law. To that end, RCW 26.09.140 provides: "Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorneys' fees in addition to statutory costs." In exercising our discretion under this statute, we consider "the issues' arguable merit on appeal and the parties' financial resources, balancing the financial need of the requesting party against the other party's ability to pay." In re Marriage of Kim, 179 Wn. App. 232, 256, 317 P.3d 555 (2014).

Here, the issues that McKinley raises on appeal have considerable merit. Furthermore, McKinley has established financial need. Specifically, McKinley

48

declares that her monthly gross income is $3,728.00. Meanwhile, her portion of monthly household expenses—which she splits equally with Sommer—totals approximately $4,171.00. In other words, McKinley's share of expenses exceeds even her *gross* monthly income by $443.00 per month. McKinley also declares that even after child support payments are taken into account, her monthly income "barely covers" her share of monthly expenses. To this end, the record reflects that McKinley is entitled to child support payments from Porter in the amount of $1,190.62 per month and from Rasmussen in the amount of $312.00 per month. But she represents that Rasmussen is "chronically behind" on paying—a fact that the trial court took into account when denying Porter any downward deviation until September 1, 2019. And in any event, McKinley would be left with little surplus even assuming that she receives the full $1,502.62 in monthly child support that she is owed from Rasmussen and Porter.

Meanwhile, according to Porter's financial declaration, his total gross monthly income is $22,890, and Laegreid's gross monthly income is $10,833, for a total gross monthly household income of more than $33,000. Porter states that his monthly net income after taxes is only $16,525 and that his total monthly expenses are $15,425 (not including legal fees). But this still leaves a monthly household surplus of $1,100, *before* Laegreid's income is taken into account. Thus, Porter has not established financial need—rather, his financial declaration establishes that his ability to pay exceeds McKinley's. For these reasons, we grant McKinley's request for attorney fees and deny Porter's request.

Porter argues, in an objection to McKinley's financial affidavit, that we

49

should decline to consider McKinley's affidavit because it was not timely. But he is incorrect: McKinley filed her affidavit within the time period specified by RAP 18.1(c) and RAP 18.6(a).[11] Furthermore, it is Porter's objection, which was not filed within seven days after McKinley served her financial affidavit, that is untimely. See RAP 18.1(c) ("Any answer to an affidavit of financial need must be filed and served within 7 days after service of the affidavit."). Therefore, we decline to consider his substantive objections.

Porter also asserts that he should be awarded fees as the prevailing party. But under RAP 18.1, an award of fees is appropriate only if authorized by applicable law. RAP 18.1(a). Because Porter cites to no applicable law granting prevailing party fees, his argument fails.

## CONCLUSION

We reverse the trial court's order restraining relocation and the trial court's modifications to the parenting plan and remand to the trial court with instructions to enter an order allowing P.J.M. to relocate with McKinley. We affirm with regard to the trial court's challenged sanctions rulings and its allocation of Dr. Wheeler's fees. On remand, we order the trial court to assign the case to a different judge for the limited purpose of determining what modifications to the

---

[11] RAP 18.6(a) provides that if the last day of a period of time computed under the rules falls on a Saturday, Sunday, or legal holiday, the period "extends to the end of the next day which is not a Saturday, Sunday, or legal holiday."

parties' 2016 parenting plan are necessary as a result of P.J.M.'s relocation.

WE CONCUR:

Dwyer, J.

Andrus, J.

Appelwick, C.J.